UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

PRIMEPAY, LLC,

               Plaintiff,                               Case No. 14-11838

v.                                            Paul D. Borman
                                            United States District Judge

RICHARD RANDALL BARNES,
TRACIE LASKIE and HIGH POINT
BUSINESS SERVICES, LLC,

               Defendants.
_____/

**OPINION AND ORDER GRANTING IN PART AND DENYING IN PART
PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION (ECF NO. 13) and
DENYING AS MOOT DEFENDANTS' MOTION TO REOPEN
PRELIMINARY INJUNCTION HEARING (ECF NO. 31)**

      Before the Court is Plaintiff PrimePay LLC's ("PrimePay" or Plaintiff) Motion for a

Preliminary Injunction.  (ECF No. 13.)  Defendants Richard Randall Barnes ("Barnes"), High Point

Business Services, LLC ("High Point") and Tracie Laskie ("Laskie") filed a Response (ECF No. 15)

and Plaintiff filed a Reply (ECF No. 18).  The Court held a multi-day hearing on October 2, 3, 6, and

7, 2014.  Following the hearing, the Court entered a Stipulated Permanent Injunction and Order of

Dismissal as to Defendant Laskie.  (ECF No. 21, Stipulated Permanent Injunction.)  The Court then

ordered post-hearing briefing from the remaining parties and received Plaintiff's Supplemental Post-

Hearing Brief (ECF No. 27) on November 17, 2014, Defendants Barnes and High Point's

(collectively hereafter "Defendants")  Responsive Supplemental Brief (ECF No. 29) on December

8, 2014, and Plaintiff's Supplemental Reply on December 18, 2014 (ECF No. 32).[1]

**INTRODUCTION**

This action involves Plaintiff's claim that Defendants have misappropriated trade secrets and other confidential information in setting up a payroll service company that competes with Plaintiff, the successor entity to Defendant Barnes's former employer. In this motion, Plaintiff argues that it is likely to succeed on its claims of misappropriation of trade secrets, breach of contract, breach of fiduciary duty and tortious interference and seeks a preliminary injunction restraining Defendants from providing or selling payroll services in the United States, soliciting or servicing Plaintiff's current and former clients, soliciting or attempting to divert Plaintiff's employees or soliciting or contacting Plaintiff's referral sources and enjoining Defendants from using, disclosing or destroying any documents, information or software programs obtained from Plaintiff or Plaintiff's predecessor entity. Defendants respond that nothing taken by Barnes constitutes a trade secret and that neither Barnes, nor Defendants HighPoint or Laskie, has solicited any of Plaintiff's customers or used any of Plaintiff's proprietary information for the benefit of any of the Defendants.

**I.     BACKGROUND**

**A.     The Allegations of the Amended Complaint and the Motion for Preliminary Injunction**

Plaintiff PrimePay is engaged in the business of marketing and providing payroll and other human resource related business services to employers throughout the United States. (ECF No. 11, First Amended Complaint ¶ 13.) In the course of providing such services, PrimePay obtains the

---

[1] On December 9, 2014, Defendants filed a Motion to Reopen Hearing on Plaintiff's Motion for Preliminary Injunction. (ECF No. 31.) Plaintiff filed a Response (ECF No. 33) and Defendants filed a Reply (ECF No. 34). For the reasons discussed *infra*, the Court finds no basis to reopen the hearing and accordingly DENIES AS MOOT Defendants' motion to reopen the hearing.

highly confidential information of its clients' employees and manages large sums of cash that are deposited into PrimePay bank accounts for remittance to governmental agencies in satisfaction of its clients' various withholding tax obligations. *Id.* ¶¶ 14-16.

In December 2013, PrimePay reorganized its business and acquired the assets of several independently-owned corporate entities that had been operating under the "PrimePay" name pursuant to agreements between PrimePay, Inc. and the individual owners of those companies. *Id.* ¶ 17. Defendant Barnes was the President and Manager of one of those independent PrimePay entities, PrimePay of Michigan, LLC ("PrimePay-Michigan"), which was originally owned by Chris Tobin who had also owned an Indianapolis-based PrimePay entity. *Id.* ¶ 19; ECF No. 15, Defs.' Resp. 1.

Under Barnes's stewardship, PrimePay-Michigan had grown from zero clients in 1999 to 950 clients in 2013. Defs.' Resp. 1. In his managerial role at PrimePay-Michigan, Barnes had access to and managed all of PrimePay-Michigan's files including highly confidential and valuable personnel and financial information provided by clients and the employees of such clients. *Id.* ¶ 39.

Effective January, 2014, the newly organized Plaintiff, PrimePay, acquired the assets of PrimePay-Michigan, and reduced Barnes's salary significantly. Barnes resigned effective March 14, 2014. *Id.* ¶ 57. At his exit interview Barnes, who did not execute a non-compete agreement with PrimePay, informed PrimePay that he would be setting up a competing entity. (Defs.' Resp. 1.) Indeed, on March 4, 2014, Barnes filed Articles of Organization for Defendant HighPoint Business Services, LLC. (Pl.'s Mot. Ex. D, Michigan Dep't of Licensing and Regulatory Affairs Filing Endorsement.)

Defendant Laskie began her employment with PrimePay-Michigan around June 3, 2010 as

3

a payroll associate. Compl. ¶ 44-45. In connection with her employment with PrimePay-Michigan, Laskie executed a Payroll Sales Associate Employment Agreement. (Pl.'s Mot. Ex. B, the "2010 Laskie Agreement"). The 2010 Laskie Agreement contained a non-compete provision precluding Laskie from engaging in any business that was in competition with PrimePay-Michigan in the states of Michigan, Ohio, Indiana or Illinois, for a period of one-year following her termination for any reason. *Id*. ¶ 9(a).

When PrimePay acquired the assets of PrimePay-Michigan effective January 1, 2014, Laskie became an employee of PrimePay as a sales executive in the Troy, Michigan office. Compl. ¶ 51-52. On March 18, 2014, Laskie executed an Employee Loyalty and Non-Disclosure Agreement with PrimePay that contained a non-solicitation and non-interference provision. (Pl.'s Mot. Ex. C, the "2014 Laskie Agreement"). The 2014 Laskie Agreement prohibited Laskie, for a period of twelve months following her termination for any reason, from directly, or indirectly through another person or employer, diverting or attempting to divert from PrimePay any client, supplier, service provider or other individual with whom PrimePay had a contractual relationship or from soliciting any such person or entity on behalf of a business other than PrimePay that competes with the services offered by PrimePay. *Id.* ¶ 3. The 2014 Laskie Agreement also binds Laskie to hold in confidence all PrimePay "Proprietary Information," including software, computer processing systems, techniques, processes, compilations of data, reports, information regarding pricing, marketing, training methods, customer information including banking, tax and financial information, which she acquires during her employment. *Id.* ¶ 1. The 2014 Laskie Agreement also prohibited her, at any time during or after her employment with PrimePay, from reproducing or utilizing in any manner PrimePay confidential information. *Id.* Laskie was terminated by PrimePay on May 22, 2014, in part due to

4

her alleged disparagement of PrimePay following Barnes's resignation.  Compl. ¶¶ 64-65.

PrimePay alleges that it took reasonable measures to protect the confidentiality of its client and financial information by (1) requiring PrimePay sales staff who have access to non-public client information to sign a non-disclosure and proprietary information confidentiality agreement, (2) binding all PrimePay employees to a corporate privacy policy requiring confidentiality, (3) utilizing password protection measures and keeping confidential client information in a restricted area on the company's server and limiting access to that information to Barnes and a limited number of personnel on a need to know basis.  (Compl. ¶¶ 23-25.)  PrimePay headquarters also took reasonable measures to protect confidential and proprietary information by (1) requiring user ID's and passwords to access PrimePay's computer system, (2) securely storing and shredding when appropriate confidential documents, (3) requiring an electronic pass key to gain access to PrimePay's headquarters, (4) using advance firewalls and data encryption, and (5) using alarms and 24/7 video monitoring.  *Id*. ¶ 26.  PrimePay-Michigan was similarly protected with the exception of video monitoring and electronic pass keys.  *Id*. ¶ 27.  According to Plaintiff, all of the confidential information to which Barnes was permitted access was to be stored on and accessed only from PrimePay's secure drive.  Such information was never to be stored on Barnes's personal laptop.  *Id*. ¶ 28.

At some point following Defendant Barnes's departure from PrimePay, PrimePay came to believe that, prior to his resignation, Barnes had deleted files from PrimePay's secure Detroit office file server, including but not limited to QuickBooks accounting files and Microsoft Access databases that are used for client tax review.  Barnes was asked to return certain PrimePay confidential information which Barnes allegedly refused to do.  On April 30, 2014, PrimePay sent Barnes a cease

and desist letter demanding, in part, the return of a PrimePay laptop and files, including PrimePay QuickBooks files, that contained highly confidential client and employee-personnel related information that was stored on the laptop that Barnes used when employed by PrimePay-Michigan. (Pl.'s Mot. Ex. E, April 30, 2013 Letter.)  The letter also advised Barnes that PrimePay reserved its right to seek legal and equitable relief and advised Barnes that he was under an obligation to preserve any PrimePay electronically stored information that he possessed.  *Id.* at 2.

With Barnes's consent, PrimePay conducted a forensic inspection of the laptop that Barnes took with him from PrimePay-Michigan, as well as several computers that Barnes and Laskie were using at HighPoint.  The inspection was conducted by Spectrum Computer Forensics ("Spectrum") and they issued their report on July 16, 2014.  (Pl.'s Mot. Ex. A, Spectrum Report.)  Plaintiff alleges in the Complaint that the Spectrum Report revealed the following:

- Analysis of Barnes's PrimePay laptop revealed that post-resignation, Barnes accessed a Dropbox (a cloud-based storage service which enables a user to store and access files from virtually any computer, smart phone or similar device that has internet access) that contained many PrimePay related files, including QuickBooks files (QuickBooks is an accounting application used for managing general ledger and financial statements) and years of tax return information (Spectrum Report 6-7);

- Sometime between April 12, 2014 and May 19, 2014, at least two files were deleted from the Dropbox that contained confidential PrimePay material, one entitled "PrimePay" that included a master payroll sales associate contract, new employee orientation materials, sales training payroll information, and the second entitled "New Folder" that included an Excel workbook containing monthly statistics of years of financial information and operating metrics (Spectrum Report 8-12);

- The Dropbox folders entitled "PrimePay" and "New Folder" were also present on the computer used by Tracie Laskie at HighPoint and both were deleted from her computer some time between April 7, 2014 and May 27, 2014.  Although the files had been deleted, a search of the computer's unallocated clusters contained numerous PrimePay related references that had been present in the "PrimePay" related Dropbox folders, including sales contract, monthly statistics, expense reports, "lost client" data and sales training payroll data (Spectrum Report 14);

6

- Ms. Laskie's computer also revealed email communications by her with former PrimePay clients (Spectrum Report 15);

- A search of the unallocated clusters of Barnes's HighPoint PC also disclosed that the Dropbox and its PrimePay related information had been synced to that computer at some point (Spectrum Report 18);

- The Dropbox folder entitled "New Folder" was placed into the Dropbox on March 6, 2014, just days before Barnes resigned from PrimePay and later synced to his new computer at HighPoint (Spectrum Report 20);

- Two files created on Barnes's PrimePay laptop under a folder entitled "New Company" just shortly before his resignation relate to planning for a new company with projections of clients, billings, revenue and costs (Spectrum Report 21).

In response to these allegations, Barnes stated in a pre-hearing Affidavit:

- The laptop belongs to Barnes as he purchased it from PrimePay with Chris Tobin's approval at the time of the merger in January, 2014 (Defs.' Resp. Ex. 5, Aug. 18, 2014 Declaration of Richard R. Barnes ¶ 39);

- Barnes created the Dropbox long before he knew that PrimePay-Michigan would be merging into PrimePay so that he could transfer and access files when he worked remotely on PrimePay matters if he was away from the office, on vacation or elsewhere and needed access to the PrimePay files, all with the knowledge and approval of Chris Tobin (*Id.* ¶¶ 36-38);

- When Barnes learned that his salary would be cut and that he could not afford to stay with PrimePay, he began working on forming his own business but only worked on these plans on his own time and never used PrimePay information or documents in planning for, launching or operating HighPoint (*Id.* ¶¶ 42-43);

- At the time of his departure from PrimePay, Barnes undertook to delete all PrimePay material from his laptop and in the Dropbox and confirmed that back up of all these files remained on the PrimePay server (*Id.* ¶¶ 44-46);

- As to the two files that the Spectrum Report identifies, the "PrimePay" and "New Folder" files, Barnes states that these were inadvertently retained and that the "New Folder" file was uploaded to the Dropbox so that Barnes could work remotely to prepare the budget for the PrimePay Troy office for 2014, that this entire file of course remained on PrimePay's main server, and that the information was used to help Barnes prepare tax returns as he had done for the previous 15 years - the file was never accessed nor the information used by him or anyone else after his departure from PrimePay and has never been used by or disclosed to anyone and he

does not recall deleting it and never consciously looked for information to delete after receiving the April, 2014 preservation letter from Plaintiff. (*Id.* ¶¶ 47-48);

• The "PrimePay" folder contained information that was never used or accessed by him after his departure from PrimePay and was never used or disclosed to anyone and has no use or value to him at HighPoint (*Id.* ¶¶ 49-50);

• As to the QuickBooks file, Barnes intentionally retained that information because he believed that Mr. Tobin, who was suffering from a significant medical condition when Barnes left the company, would call upon him to prepare the 2014 tax returns as he had been the preparer for the past several years - the file also was retained on the PrimePay main server, is of no competitive use to Barnes at HighPoint and Barnes's counsel immediately offered to delete the file from his computer or return it to PrimePay but has never had a response to that offer (*Id.* ¶¶ 51-59);

• Certain other files that Barnes deleted before his departure were files that he created to demonstrate to the new PrimePay management his ideas for tracking and reconciling client accounts, tracking client billings for figuring sales commissions, and reconciling tax returns between the Troy office and Tobin's Indianapolis PrimePay office, but Jason Wood of the "new" PrimePay management indicated that they would not be using those methodologies, so Barnes deleted the files (*Id.* ¶¶ 60-66).

• Before hiring Tracie Laskie at HighPoint, Barnes requested a letter from Laskie's attorney confirming that she was no longer under any covenant not to compete with PrimePay, which was supplied and explained that she was no longer subject to a covenant not to compete but had signed a one-year non-solicitation agreement shortly before leaving PrimePay (*Id.* ¶¶ 67-69);

• Barnes attests that no PrimePay information is used at HighPoint, by either he or Ms. Laskie and that HighPoint has not solicited, either directly or indirectly, any PrimePay clients, although some may have independently contacted Ms. Laskie (*Id.* ¶¶ 73-77).

Barnes asserts that he explained all of this to PrimePay's counsel in a series of correspondence following receipt of the April, 2014 cease and desist letter and adds that he fully cooperated with PrimePay's review of his laptop and of the HighPoint computers. (Defs.' Resp. Exs. 2-4.) Defendants assert that PrimePay has instituted this specious trade secret action in bad faith in an effort to prevent Barnes from entering into a legitimate competing payroll services

8

company.

**B.     The Evidentiary Hearing**

The Court held a multi-day hearing and received extensive testimony and evidence. Following the evidentiary hearing, the Court received supplemental briefing to narrow the issues that remained in contention, particularly given the stipulated dismissal of Defendant Tracie Laskie.  At the outset of the hearing, the Court confirmed with the parties that Barnes's salary was going to be reduced from $210,000 to $80,000 as a result of the acquisition by PrimePay of PrimePay-Michigan. (ECF No. 22, Transcript of Hearing on Motion for Preliminary Injunction held on October 2, 2014) (hereinafter "10/2/14 Hr'g Tr. __.")

**1.     Martin C. Stowe**

Plaintiff's first witness was Martin C. Stowe, the Chief Services Officer for PrimePay. Stowe had been with PrimePay for two-years, having previously been employed for 25 years by Paychex.  (10/2/14 Hr'g Tr. 7-8.)  Stowe explained that PrimePay has over 30 offices throughout the United States, 12 of which are payroll processing centers.  *Id*. at 9.  PrimePay obtains its clients through two principal means: client referrals and referrals from strategic business partners.  *Id*. at 10.  Strategic business partners are Certified Public Accountant ("CPA") firms, banks and brokerage firms who PrimePay calls on and who in turn recommend to their clients that they use PrimePay services.  *Id*.  Specific PrimePay sales representatives are assigned key strategic partners who they call on weekly and/or monthly to "nurture" the strategic business partner relationship in the hope of receiving more referrals and, for the specific sales associate, greater commissions.  *Id*. at 11.

PrimePay acquired PrimePay-Michigan from Chris and Sue Tobin on December 31, 2013, in a transaction in which the Tobins received a $3.5 million (3 times PrimePay-Michigan's annual

9

revenue) equity valuation of stock in exchange for all of the assets of PrimePay-Michigan. *Id.* at 13. As a result of the acquisition, there was a consolidation of all independently owned PrimePay offices throughout the United States and each independent owner, including the Tobins, executed a Contribution Agreement, in which they agreed to transfer to PrimePay without exclusion all assets including goodwill "used or useable in connection with the Business." *Id.* at 14, Pl.'s Ex. 1, Dec. 31, 2013 Contribution Agreement ¶ 1, Schedule 3 p. 18. According to Stowe, this included all tangible assets, such as furniture, fixtures, computers and laptops as well as financial and banking records, accounts receivable and accounts payable, as well as "good will assets," such as "the client relationships and ongoing client business, the relationships with strategic business partners, and the reputation of PrimePay of Michigan." 10/2/14 Hr'g Tr. 14. According to Stowe, the strategic business partners were "key referral sources" that had been "invested in and nurtured through the years," and were of significant business value in the acquisition of PrimePay-Michigan. *Id.* at 15, 55.

Stowe met Barnes in early October, 2013, shortly before the announcement of the consolidation. *Id.* at 16. Stowe testified that Barnes, as President of PrimePay-Michigan, would have had access after the consolidation to PrimePay's confidential business information, including financial records (revenues, expenses, profit and loss and margins), financial history, client account information, and "the features and functionalities and competitive advantages of the PrimePay offerings and software," as well as knowledge of "the strategic business partners, their history, their level of referral sources, which ones referred more, which ones referred less, and the relationship histories for each of them." *Id.* at 21-23, 26. The financial information in particular was very important to PrimePay's "ongoing business, as far as [] budgeting, [] forecasting, [] strategic

10

planning." *Id.* at 35.   Stowe testified that PrimePay went to "great lengths" to protect this information by password protecting and encrypting the information and allowing only certain individuals within the accounting department, which itself is kept behind locked doors, access to this confidential information. *Id.* at 23-24, 38.   PrimePay also has noncompete and technology agreements that require employees to keep this information confidential and none of the information is made publicly available. *Id.* at 24.

Stowe testified that Barnes, as President of PrimePay-Michigan, would have had continuing access to all of this financial and confidential information after the consolidation and that Barnes was supposed to "migrate the financial management and financial data to [PrimePay's] accounting department," including "information on the key strategic business partnerships through various customer relationship management software that would have been used [by PrimePay-Michigan]." *Id.* at 26 (alterations added).   Following the consolidation, Barnes's access to confidential information would have been limited after the migration of the PrimePay-Michigan data because accounting of all of the independent PrimePay entities was being consolidated into a central accounting department and Barnes would have had less access to sales organization data and possibly to daily activities regarding strategic business partners. *Id.* at 27.

Stowe testified that when the consolidation occurred, and the migration was supposed to take place, certain data from the Detroit PrimePay-Michigan office was missing.   This included "a number of QuickBooks files that were integral to running that office that [PrimePay] was unable to obtain." *Id.* (alteration added).   Stowe explained that the "QuickBooks" were used as a reconciliation tool for PrimePay's "PrimeChecks accounts." *Id.* at 32; Pl.'s Exs. 14a-c, 17a-g Sample QuickBooks files.   PrimeChecks is a service provided to certain clients who "entrust

11

[PrimePay] by giving [them] essentially their net pay that [PrimePay] deposit[s] into a PrimePay, LLC account, and their checks will run through and reconcile through that account." *Id*. at 32. PrimePay has "a fiduciary responsibility to make sure that we monitor that on a daily basis, reconcile it. And those files were missing." *Id*. Stowe testified that not having the QuickBooks files disrupted PrimePay's business because they were "handcuffed to provide any information to clients regarding their reconciliations and clearing of checks." *Id*. at 37, 46-47. Stowe testified that the information contained in the QuickBooks files would be of value to a competitor, who could glean from the QuickBooks client names, amounts of their net payrolls so that a competitor could call on these clients with the benefit of this historical data. *Id*. at 38, 48.

According to Stowe, Detroit was the only office from whom PrimePay did not receive complete financial information following the consolidation, and they tried to work with Barnes to obtain this information and he recalled that someone contacted Barnes who agreed to have PrimePay's accounting manager contact him about the QuickBooks files. *Id*. at 28, 31, 37. In fact, it was Amy Wasilewski who asked Stowe, on or about March 17, 2014, about the QuickBooks files and Stowe testified that he contacted Barnes and asked him to contact Amy about the QuickBooks files. *Id*. at 104-05. Ms. Wasilewski never indicated to Stowe that she was unable to reach Barnes or unable to obtain the QuickBooks information. *Id*. at 105-07. In fact, an email from Barnes to Ms. Wasilewski dated March 17, 2014, the very date that Stowe reached out to Barnes, attached the QuickBooks files with handwritten annotations explaining what information the documents relayed. *Id*. at 111-12. Stowe testified that it was wrong for Barnes to retain these documents after leaving PrimePay because "in the hands of a competitor [they] would allow you to know the financial stability and viability of the competitor," so that [w]hen you approach a client, you know how to

12

discount . . . how far or what charges you could charge a client." *Id*. at 39 (alteration added). Not all PrimePay clients utilize the PrimeChecks service and thus not all PrimePay client names appear on the QuickBooks documents. *Id*. at 49.

Also missing from the financial documentation that Barnes was supposed to migrate to PrimePay from PrimePay-Michigan were monthly statistic spreadsheets which "measured every business analytic from revenue sources, billing sources, sales activity, the client analysis and breakdown by the clients of their weekly processing, their billing." *Id*. at 41-42; Pl.'s Ex. 15. It was important for PrimePay to have this historical information for PrimePay-Michigan for budgeting, forecasting and strategic planning. *Id*. at 42. These business analytics, according to Stowe, would provide a competitor with "a blueprint of revenue buildups, profitability, basically how to build a business." *Id*. at 43.

Stowe also identified exhibits offered by Plaintiff that included names of PrimePay strategic business partners and, in some instances, the names of contacts at those strategic business partners and clients, along with their contact information. (*Id*. at 50; Pl.'s Exs. 17h, I.) Stowe testified that these documents illustrated the type of information that would appear on client management software such as ACT! 10/2/14 Hr'g Tr. 52. ACT! is a client management software that allows one to "track key engagements, transactions, the relationship with particular prospects, strategic business partners." *Id*. at 55. Stowe testified that this type of information would be of competitive value because "it shows key strategic business partners that are apt to refer their clients to companies such as PrimePay." *Id*. at 57. Stowe testified that these lists of strategic business partners were assets of PrimePay-Michigan that were purchased by PrimePay in the consolidation. *Id*. at 58. PrimePay did receive client relationship information like this from other independent PrimePay offices that

13

were part of the consolidation but did not receive this information from Barnes.   *Id.* at 54. Plaintiff's forensic computer expert later testified that these documents were found on Barnes's laptop computer which he took with him when he left PrimePay.

Stowe also identified exhibits that contained PrimePay's confidential pricing and billing tables, illustrating the prices charged by PrimePay for various services and payroll processing. 10/2/14 Hr'g Tr. 59-60; Pl.'s Exs. 17k, l.  This information had competitive value, according to Stowe, because a competitor would know, at least for a period of time, what products PrimePay was offering, what they charged for those services and what they charged for payroll processing of certain checks.   10/2/14 Hr'g Tr. 61.   Stowe also identified training materials that outlined PrimePay's training program for its sales associates, which Stowe considered to have competitive value.  *Id.* at 63; Pl.'s Ex. 17m.  Stowe further identified a sample monthly billing summary for all of PrimePay's clients at the Detroit office, showing frequency of billing (i.e. were they billed monthly, biweekly, semi-monthly, monthly, etc.), the check charges and other ancillary charges that were billed to each client, in sum all of the invoice charges that PrimePay would have billed these clients. 10/2/14 Hr'g Tr.  64-65; Pl.'s Ex. 19b.  Stowe testified that this information would be of competitive value to Barnes at High Point because it would allow him to call on these clients, knowing they are apt to outsource their payroll and knowing what they have paid for these services in the past.  *Id.* at 66-67.

Barnes did not have a non-compete agreement with PrimePay, *id.* at 71, but Stowe testified to his belief that Barnes was still obligated to act in the best interests of PrimePay when leaving the company, *id.* at 75.  According to Stowe, Barnes should have turned over all files and property in his possession to PrimePay and now has an unfair competitive advantage because High Point now

14

has "a complete history of [PrimePay's] financial transactions, [] vulnerabilities, client names, strategic partnerships and so forth." *Id*. at 75. Stowe testified that PrimePay lost 115 clients in 2013 and had lost another 133 in 2014 as of the date of his testimony. *Id*. at 77. Stowe could not state how many, if any, of those clients were lost to High Point but claimed that sources had informed him that some had in fact gone to High Point and confirmed that some of the lost clients did go to competitors other than High Point. *Id*. at 78, 97-98.

On cross-examination, Stowe conceded that PrimePay did not have an exclusive referral relationship with its strategic partners and that any one of them could refer clients to other payroll processing companies, including High Point, if they so chose. *Id*. at 90-91. The strategic business partners were under no requirement to refer any particular number of clients to PrimePay or to do it for any specified length of time. In fact, there was no contractual relationship at all between PrimePay and its strategic business partners. *Id*. at 91-92. Stowe also acknowledged that after the consolidation, around July, 2014, PrimePay instituted price increases at the Detroit office for various services, including check processing, tax filing and other ancillary products. *Id*. at 92. PrimePay also experienced "quite a turnover of [their] payroll specialists" after the consolidation. *Id*. at 98. Stowe acknowledged that these other factors may have contributed to clients migrating to other payroll services companies, and he conceded he had no knowledge, in any given case, why a specific client left PrimePay. *Id*. at 99-100. Stowe had no information regarding whether Barnes had accessed any of what Stowe deemed to be PrimePay's confidential information after he left PrimePay but Stowe believed that Barnes never should have possessed such information at any time after leaving PrimePay. *Id*. at 120, 124.

15

### 2.     Jeffrey Dorfman

Jeffrey Dorfman is the area sales manager for PrimePay in Detroit, Indianapolis and Chicago. 10/2/14 Hr'g Tr. 126.   Dorfman testified about the significance of the strategic partners.   He explained that "a referral from a strategic partner closes at a very high rate which helps with the success of our business.   Secondly, it helps get our name out, improves the number of sales that we will have in a given year.   We rely on them for a good chunk of our business."  *Id*. at 127.   He explained that relationships with strategic business partners are forged in a "very organic" way, by visiting them every three to four weeks and giving them "drops," such as sweets, doughnuts and such.  *Id*. at 128.   In his experience, the majority of clients are obtained through strategic partners. *Id*. at 129.   Dorfman also testified that no sales data was available to him when he took over at PrimePay's Detroit office.  *Id*. at 131.   When shown Plaintiff's Exhibit 17i, Dorfman testified that this was the type of information that he would have expected to have received from PrimePay and that this information would have been uploaded into the Salesforce client referral management system ("CRM") software that was used at PrimePay after the consolidation.  *Id*. at 134.   Dorfman testified that, although he did have a list of the current PrimePay clients when he took over sales at PrimePay's Detroit office, the type of information that would have been pulled from PrimePay's existing CRM would have been very helpful, particularly in view of the high turnover of sales associates and the number of new sales associates coming into the territory with no background on the client base.  *Id*. at 134-35, 170.

The majority of Dorfman's testimony concerned his interaction with Tracie Laskie, her termination and her understanding, as expressed to him, of the restrictions imposed by her non-compete and non-solicitation agreements.   Dorfman testified that Laskie told him that Barnes told

16

her that she could not call on former PrimePay clients when she joined High Point but that she could "take her CPAs with her." *Id*. at 144.  Dorfman was able to identify a couple of clients that he was sure had followed Laskie to High Point, including Lux Lounge.  *Id*. at 146-47; Pl.'s Ex. 22. Dorfman conceded, however, that he had never talked to Lux Lounge to find out why they left PrimePay and had no idea why they decided to make the switch to High Point.  *Id*. at 155.

### 3.    John Stott Matthews

Plaintiff conducted a forensic analysis of Barnes's laptop as well as his desktop and the High Point computers.  John Stott Matthews, the forensic computer specialist who authored the Spectrum Report,  testified at the evidentiary hearing regarding the findings of that forensic exam.  10/2/14 Hr'g Tr. 176.  On May 21, 2014, Matthews analyzed three computers that were located at Barnes's residence – a 320-gigabyte hard drive out of a Dell laptop, a 250-gigabyte hard drive out of an older tower and a two-terabyte hard drive out of a new tower.  *Id*. at 176-77.  On June 11, 2014, Matthews analyzed three computers that were present at the High Point offices – one belonging to Barnes, one to his assistant Linda and one to Tracie Laskie.  *Id*. at 177-78.

The main focus of the Spectrum analysis was on the 320-gigabyte hard drive from Barnes's Dell laptop that was recovered from his residence.  As alleged in the Complaint, and discussed *supra*, Matthews's analysis yielded the information contained in the reports introduced by Plaintiff in Exhibits 11-19.  The reports were created by Matthews to illustrate the information that he found on the various devices that were analyzed.  Matthews created listings of the files that were found on a device, categorized by Matthews by certain titles and omitting in certain instances particular files to facilitate review of the information that he found.  *Id*. at 178-79.  For example, Exhibit 11b, in a legend at the top of each page of the Exhibit, explains that the report lists the "User Files," those that

17

are most commonly used in the business application such as .DOC, .PDF, .JPG, .TIF, that were found on Barnes's 320G Dell laptop, excluding for purposes of this listing the contents of the recycle bin and excluding a Dropbox account. *Id*. at 179, Pl.'s Ex. 11b. The listing contained in Exhibit 11b does not contain all of the active files on the Dell laptop, only those types of files that Matthews defined as the most commonly used files for the business application. *Id*. at 180, 184-85. The listings in Exhibit 11b excluded another file extension that appeared with frequency on the hard drive, .ONE, that was not "originally on the radar" for the forensic analysis. *Id*. at 187-88. Those files are separately listed on Exhibit 11a. *Id*. at 185.

Matthews explained the meaning of each of the categories or columns of data that he included in this particular report: "Name" indicates the name given that particular file or folder by its creator (*id* at 180); "File Ext." such as .doc defines the operating system that will open that particular file (*id*. at 180-81); "Del. ?" indicates a file that was deleted but did not appear in the recycle bin (*id*. at 181); "Last Accessed" date can indicate the date on which a file was opened but can also indicate the date on which the file was copied somewhere else and can be "somewhat inconclusive" when analyzing a Windows 7 implementation of the operating system which was utilized on the Dell laptop (*id*. at 181-82); "File Created" date is the date on which the file was created on that device except when the "File Created" date is newer than the "Last Written" date, in which case the "File Created" date would be the date that the file was copied to that device (*id*. at 182); "Last Written" date relates to when a change was made to the document, such as a revision that is saved or printing the document or simply saving the document (*id*. at 182); "Entry Modified" date on this listing indicates the date on which a file is copied from one device to another but the Entry Modified date on the Recycle Bin Report (Pl.'s Ex. 12c) indicates the date on which the file

18

was deleted (*id*. at 183); "Logical Size" is the size of the document in bytes (*id*. at 183); "Full Path" was not well explained but appears to indicate the movement of the document on the hard drive (*id*. at 183).

Another file of importance in the Spectrum analysis was the OneNote file that was found on Barnes's laptop. The contents of this file is listed on Plaintiff's Exhibit 11a. Exhibit 11a lists active files on the laptop with file extension .ONE, a Microsoft OneNote application file. Exhibit 11a also includes some QuickBooks file types, marked by any file extension that begins with .q, that were not included on the original QuickBooks report, Pl.'s Exs. 13, 14. 10/2/14 Hr'g Tr. 185-87. Matthews explained that a OneNote file is an "electronic notebook where you can store different files in an organized envelope or folder-style status." *Id*. at 186-87. Matthews explained that the OneNote files are not typically found among the active files in a business setting, so initially they did not include an analysis of the OneNote files in their Report. Once they began the forensic analysis, however, it became clear to them that in this instance the OneNote files were important for the parties to review so they separately created the OneNote report reproduced in Exhibit 11a. *Id*. at 187-88.

Matthews took special note with regard to a particular OneNote file listed on Exhibit 11a, found on page 6 of Ex. 11a at the 7th entry from the bottom showing an Entry Modified date of April 18, 2014. Matthews created a more detailed report of the information found in that file and reproduced that information at Plaintiff's Exhibit 17a. Matthews testified that the April 18, 2014 Last Written and Entry Modified date on Exhibit 11a indicated that the OneNote file was opened on that date, a date after Barnes's departure from PrimePay. ECF No. 23, Transcript of October 3, 2014 Hearing on Motion for Preliminary Injunction at 7-9 (hereinafter "10/3/14 Hr'g Tr. __.")

19

Matthews summarized that all PrimePay files listed in Plaintiff's Exhibits 11a and 11b, including the detail found in Exhibit 17a, were found on Barnes's Dell laptop.  10/2/14 Hr'g Tr. 188; 10/3/14 Hr'g Tr. 8.

Also found on the Dell laptop were a number of PrimePay QuickBooks-related files which are separately listed on Plaintiff's Exhibit 13a. As Matthews explained earlier in his testimony, on this report where the path indicates recycle bin, the Entry Modified date is the date that the file was deleted. *Id*. at 193.  Matthews found it significant that on May 1, 2014, the date on which Barnes received a cease and desist and document preservation letter from Plaintiff's counsel at 1:03 p.m. (Pl.'s Ex. 7), several files containing PrimePay related descriptions were deleted from the Dell laptop between 6:57 and 7:15 p.m. that same day. *Id*. at 192-94.  Matthews also found it significant that on November 4, 2013, a date after Barnes allegedly knew about the consolidation but before he left the company, there was a lot of activity with regard to the PrimePay QuickBooks files that were on the Dell laptop. *Id*. at 194-95; 10/3/14 Hr'g Tr. 5-6.  The contents of the large QuickBooks file, 202 megabytes (202,072,064), listed as the first entry on Exhibit 13a, is reproduced in greater detail in Plaintiff's Exhibits 14a-c. *Id*. at 6-7.  Exhibits 14a-c contain December, 2013 profit and loss detail for PrimePay-Michigan as well as customer deposit detail for PrimePay-Michigan for December, 2013.   Matthews also noted the significance of a large Outlook mailbox file (approximately 3.9 gigabytes) for rbarnes@primepay.com that was listed among the files on Exhibit 11b, at page 4 of Exhibit 11b (page 14 of Exhibit 11), eleven lines from the bottom of that page. *Id*. at 9-10.  In addition to the size of this file, Matthews found it significant that the Last Written date of March 26, 2014, which he explained in a mailbox application means the date on which the file was either opened or closed, indicating that Barnes went into his PrimePay mailbox on his laptop

computer on March 26, 2014, after he had resigned from the company. *Id*. at 10-11.

Matthews also found of interest several files located on Barnes's Dell laptop in the Dropbox folder and created a separate report listing folders in the Dropbox identified as containing PrimePay materials. *See* Pl.'s Ex. 10a. Analyzing the Dropbox related materials on Barnes's Dell laptop, Matthews was able to determine that two folders, one titled "PrimePay" and one titled "New Folder," were deleted from the Dropbox sometime after Barnes left the company. 10/3/14 Hr'g Tr. 18-20. Matthews was able to determine that the "New Folder" was deleted on May 4, 2014 (*id*. at 20-21) and the "PrimePay" folder sometime between April 21, 2014 and May 21, 2014 (*id*. at 22-23). The "New Folder" contained PrimePay monthly spreadsheets with confidential operating metrics for PrimePay, *e.g.* check counts, discounts, monthly billing, outstanding balance, for each month from approximately 2000 to 2012, as set forth in Plaintiff's Exhibit 15. These files were active on Barnes's Dell laptop when he left PrimePay and were deleted on May 4, 2014, after his resignation and after Barnes received the cease and desist/document preservation letter on May 1, 2014. 10/3/14 Hr'g Tr. 20-21. Matthews did not generate a separate report for the contents of the "New Folder" but included a description of the contents of that folder in his Report. *Id*. at 32-33. The contents of the "PrimePay" folder, detailed in Plaintiff's Exhibit 10b, were deleted from the Dell laptop sometime between April 12, 2014 and May 21, 2014. *Id*. at 22-23.[2]

Matthews also found it notable in his analysis of the files in the Recycle Bin on the Dell laptop that many files, approximately 140, were deleted on May 1, 2014, at approximately 7:00 p.m., the date on which Barnes received the cease and desist/document preservation letter. *Id*. at 35-36.

---

[2] This analysis is also supported by additional screenshots and further analysis contained in Matthews's Report, Plaintiff's Exhibit 9, which was admitted into evidence at the preliminary injunction hearing without objection from Defendants. 10/3/14 Hr'g Tr. 26.

Finally, Matthews testified regarding an analysis he conducted of certain client management relationship files that were found on Barnes's Dell laptop.  Pl.'s Ex. 16.  This analysis purports to demonstrate that before Barnes left PrimePay, sometime in November, 2013, he copied ACT! files from the PrimePay desktop computer that he left at PrimePay onto his Dell laptop.  *Id.* at 24-29.

Matthews testified that he retrieved "very, very few" files on the High Point computers because the majority of activity used to run the High Point computers was done using a cloud-based, or Internet-based application and he did not have access to the High Point cloud-based system at the time he performed his analysis. 10/3/14 Hr'g Tr. 11-12.  Matthews found a few webmail artifacts that were located in unallocated clusters (or empty space on the hard drive) on the High Point computers.  *Id.* at 13-14.

On cross-examination of Matthews, Defendants sought clarification of those files that Plaintiff claims that Barnes actually *accessed* after his resignation.  *Id.* at 42-43.  Other than the PrimeChecks files accessed on March 17, 2014, the date on which Amy Wasilewski asked Barnes to send her the PrimeChecks data, the only other PrimePay related files that Plaintiff claims Barnes accessed after his departure are (1) Exhibit 17a, the OneNote file discussed *supra* and (2) the file activity on Exhibit 11b, page 4, discussed *supra*, that indicates that Barnes accessed his PrimePay mailbox on March 26, 2015.  *Id.* at 45.  Specifically, with regard to the "New Folder" and "PrimePay" folders that appear to have been deleted on May 4, 2014 and between April 12, 2014 and May 21, 2014, Pl.'s Exs. 15 and 10b respectively, Matthews had no idea when those folders or files were last accessed.  *Id.* at 45-47.

### 4.    John Allen

John Allen is the vice president of information security and governance for PrimePay.

10/3/14 Hr'g Tr. 61. Allen worked with PrimePay's Human Resource Department to create the company's Technology Policy, which was first distributed to managers on January 1, 2014. (Pl.'s Ex. 4.) Allen testified that Barnes was required to comply with this policy. *Id*. at 63. According to Allen, Barnes was in charge of protecting confidential information from the Detroit PrimePay office. *Id*. Allen testified that Barnes deleted over 2,000 files from the PrimePay server sometime between March 6, 2014 and March 16, 2014, when Barnes left the company. *Id*. at 66; Pl.'s Ex. 19a. Allen testified that deleting these files from the server was a violation of the PrimePay Technology Policy. *Id*. at 67. Allen also testified that there were copies of the ACT! client referral management data on the PrimePay server but that he did not have the passwords to access that data. *Id*. at 68. Allen testified that Barnes's Dell laptop was the property of PrimePay, not the property of Tobin and should never have been sold to Barnes. *Id*. at 69. Barnes was not authorized to access any PrimePay files following his resignation, including his Outlook email account. *Id*. at 70. Of the 2,000 files listed on Exhibit 19a, Allen did not undertake to determine which files or folders were in fact PrimePay related and conceded that many of the files contained photographs and music, which were not to be kept on the PrimePay server. *Id*. at 72-73. Allen also acknowledged that there were some 300 referral contacts that were on the PrimePay server that were able to be added to the PrimePay Salesforce database. *Id*. at 75.

### 5.    Randall Barnes

Barnes has a long history in the payroll services industry. Barnes got to know Chris Tobin in the early 1980's when Barnes was employed as a regional manager at Paychex in the Detroit office. 10/3/14 Hr'g Tr. 77. Barnes hired Tobin and moved him to the Paychex branch in Indianapolis. Barnes occupied a management position at Paychex for seven years and had

responsibility for establishing and growing branch offices. *Id*. at 78. The principal way that Paychex sought out, obtained and secured customers was by hiring salespeople to call on CPAs. *Id*. Barnes left Paychex and went to a company called ABOW and became the chief operating officer. *Id*. at 79. Barnes returned to the payroll industry in 1999 when Tobin contacted him about wanting to leave Paychex and start his own payroll services company. *Id*. Ultimately, a number of individuals got together to form PrimePay and Tobin asked Barnes if he would be interested in opening up a Detroit PrimePay office, to which Barnes responded "absolutely." *Id*. at 81. Tobin and his wife would be the owners and Barnes would run and manage the Detroit office. *Id*. at 82. The expectation was that Barnes would become a 50% owner. He began the Detroit office with zero clients and when he left in 2013, the branch had over 950 clients. *Id*. at 82.

Barnes instituted the ACT! client management software program at PrimePay-Michigan in about 2003. Prior to that time, sales associates were keeping pencil records. *Id*. at 83. The software enabled PrimePay to keep track of contacts and to record activities with those contacts. If Barnes called on a CPA he would record that activity and schedule a follow-up meeting. He instructed his sales associates to do the same thing. *Id*. at 84. Each sales associate maintained their own ACT! database and then they would all sync the database at their sales meetings. *Id*. at 85. This resulted in a large, active database with probably several thousand entries that was backed up on Barnes's computer. *Id*. at 85-86. They used ACT! up until sometime in 2013 when the salespeople were no longer comfortable with the ACT! software, finding it too "clumsy." *Id*. at 85. They began using a new client management software called Landslide which Tobin was using in Indianapolis and began entering client and contact information into that new database because a single synchronization with ACT! was not possible. *Id*. at 86. The salespeople were not happy with

24

Landslide either so the company migrated to Pipeline which was cloud-based, and ultimately were not happy with that product either. *Id*. at 87-88. Before he could even begin to attempt to put the data collected in Landslide into Pipeline, in February, 2014, rumblings of the consolidation began and the word was that everyone would be migrating to Salesforce. *Id*. at 88. Barnes left in March, 2014 and did not see Salesforce installed. *Id*. Barnes testified that he did not like any of the other CRM software programs that they tried and decided just to stay with ACT! so in late 2013 he created RBarnes Personal ACT! to maintain his PrimePay activity. *Id*. at 89. Barnes's last day in the PrimePay office was March 13, 2014. *Id*. at 90. Barnes thought that he left the general ACT! Database on the PrimePay server; he did not intentionally delete any of the ACT! data and no one ever asked him for his ACT! Password. *Id*. at 90-91. The Randy Personal ACT! database contained only Barnes's personal contacts and calendar, if he personally dealt with a client or fixing a problem, and the personal ACT! database did not contain any of the other salespeople's contact information. *Id*. at 163.

Barnes testified that he used a laptop computer (he had several different laptops over the course of his employment, *id*. at 94) for 12 of his 15 years at PrimePay. *Id*. at 93. He used it to access the office remotely so that he could work from home, took it to client meetings to demonstrate services and illustrate products and he used it for QuickBooks. *Id*. at 93-94. He used QuickBooks to record the financial records of the company and also to prepare company tax returns. He recorded sales through a statistics file that would provide him with monthly reports. He did not record sales individually by customer in QuickBooks. *Id*. at 95-96. Barnes explained that the customer names that are seen in some of the QuickBooks files are the PrimeChecks clients, a small group of 20 or 25 customers (out of 950-1,000) who used the PrimeChecks service. *Id*. at 96. The

25

QuickBooks files contained no information about pricing or billing customers. *Id.* at 97.

Barnes was told by Tobin that the QuickBooks files were still PrimePay-Michigan files and were to be used to prepare the 2014 tax return for PrimePay-Michigan. *Id.* at 98. Also, after the consolidation, Barnes continued to be the sole signatory on the PrimePay LLC checking account and on the PrimeChecks account and continued to enter those transactions into the QuickBooks. *Id.* at 102-03. Also, at Amy Wasilewski's request, Barnes did the reconciliation for the February, 2014 QuickBooks after his resignation and sent a paper copy to Ms. Wasilewski sometime after his resignation on March 3, 2014. *Id.* at 104. She asked for an electronic copy, which Barnes did not get to before he left and he still had the QuickBooks on his laptop as he was intending to prepare the tax return for Tobin. *Id.*

At some point after Barnes resigned, Stowe called Barnes and explained that Ms. Wasilewski needed the QuickBooks reconciliation report, which Barnes prepared and sent to Ms. Waslewski on March 17, 2014. Barnes told her at that time that he needed to keep the QuickBooks so that he could prepare the tax return, to which she had no objection. *Id.* at 105. Barnes explained that the March 17, 2004 Last Written dates in Plaintiff's Exhibit 12c related to his sending Ms. Wasilewski the QuickBooks reconciliation reports. *Id.* at 106. Barnes explained that the typewriting on the top of the first page of Plaintiff's Exhibit 17g was put there by him and that this was the attachment that Barnes sent to Wasilewski on March 17, 2004. *Id.* Barnes explained that Defendants' Exhibit 6, a March 17, 2014 email from him to Ms. Wasilewski, was the email to which the QuickBooks information was attached, as explained in the email. *Id.* at 107-08.

Barnes also explained that Tobin, whom Barnes believed to be a member of PrimePay, LLC, the Plaintiff in this case, was aware that Barnes still had the QuickBooks files after he left PrimePay,

26

as illustrated by an email that Tobin sent to Barnes on March 25, 2014, thanking Barnes for sending Tobin a repeat copy of the tax return that Barnes had prepared. *Id*. at 101, 108-09. Barnes testified that Tobin was absolutely aware that Barnes was taking the QuickBooks information with him on his laptop because Tobin had instructed Barnes to finish certain financial transactions that required the QuickBooks and to prepare the tax return, which also required the QuickBooks. *Id*. at 109-10.

When asked about Plaintiff's Exhibits 14a, b, and c, the sample PrimePay QuickBooks files found on Barnes's Dell laptop, Barnes saw no competitive value to High Point in the information contained in these documents because the PrimeChecks product is not offered by High Point. *Id*. at 113-14. Similarly, with regard to the monthly statistical reports contained in Plaintiff's Exhibit 15, Barnes testified that he used this information at PrimePay to follow trends but would find it of no value to him at High Point. *Id*. at 116. Barnes testified that he was unaware that he had retained this information on his laptop when he left PrimePay and that the last time he accessed this information was when he prepared the budget for Stowe in early March, 2014, before he left PrimePay. *Id*. at 116-17. Barnes testified that before he left PrimePay, he tried to delete from his laptop those files that he thought were PrimePay related. *Id*. at 117.

With regard to Plaintiff's Exhibit 17a, the reconciliation detail for the QuickBooks files that Plaintiff suggests was accessed by Barnes on April 18, 2014, after his departure from PrimePay, Barnes had no recollection of opening this OneNote file on that date. *Id*. at 118. He noted that nothing in the title of the file would have alerted him that it contained PrimePay information and he stated that he may have looked at it to see what it was but had no recollection of doing so. *Id*. at 118-19. Barnes also found nothing in Exhibit 17a that would have been of competitive advantage to him at High Point as it contained information pertaining to PrimeChecks, a product that High

Point does not even offer. *Id.* at 120. With regard to Plaintiff's Exhibits 17b-e, PrimePay material that the Spectrum analysis concludes was deleted on May 1, 2014 (*see* Pl.'s Ex. 12c), Barnes testified that the information contained in these exhibits related to the reconciliation detail provided to Ms. Wasilewski on March 17, 2014 and he testified that none of the information would be of competitive value to him at High Point. 10/3/14 Hr'g Tr. 120-22. With regard to Exhibits 17f-m, Barnes recognized these as PrimePay documents but testified that he never accessed them after leaving PrimePay and would find none of them competitively advantageous to conducting business at High Point. *Id.* at 122-26.

Regarding the listing on Plaintiff's Exhibit 11b that Plaintiff alleges demonstrates that Barnes accessed his PrimePay Outlook mailbox on March 26, 2014, after his departure, Barnes did not recall for certain whether he accessed that account on that date but did recall that about that time he did set up his High Point Outlook mail account and may have had to access the old PrimePay Outlook mailbox in order to do that. *Id.* at 126-27. Barnes testified that as of March 26, 2014, he was still in the process of evaluating software for High Point and purchasing equipment and had not even found office space or hired any employees as of that time. *Id.* at 127.

Barnes explained that when he began working for Tobin to set up PrimePay-Michigan, they discussed a non-compete and agreed that setting up a competing business at least 50 miles away seemed like a reasonable restriction, but they never actually executed a non-compete. *Id.* at 130. However, out of respect for those discussions, when Barnes left PrimePay he informed PrimePay that he would be setting up a competing business and he ultimately located High Point 50.5 miles from the PrimePay offices. *Id.* at 129-30. Barnes testified that he did not believe he was under any restriction when he left PrimePay not to solicit PrimePay clients but nonetheless he has not solicited

28

any former PrimePay clients and has never used any confidential information that he retained in his "head." *Id.* at 130. Barnes believed that when he left PrimePay he had deleted everything that would have been PrimePay related from his laptop, that he did not take anything knowingly, other than the QuickBooks file and the tax returns, and would not have used anything had he inadvertently retained it and come across it at High Point. *Id.* at 131, 161. Barnes concedes now that much of the information that he had on his laptop, which he claims he did not know was still there, was in fact PrimePay's confidential information. *Id.* at 185-87, 197-201. He steadfastly maintains, however, that he did not know that such confidential information was on his laptop. *Id.* at 202.

When asked about the deletions from his laptop that appeared to have occurred on May 1, 2014, the same day that Barnes received the cease and desist/document preservation letter, and about apparently deleting the "New Folder" containing statistical spreadsheets on May 4, 2014, Barnes admitted receiving the letter and explained as follows:

> When I received this letter, I read it, and when I got to Mr. Jenkins' signature, I didn't pay attention to the bottom part. It looked like boilerplate. It looked like, "This is confidential, if you're not the recipient, please delete it," that kind of language, and I honestly didn't read it.

> I – obviously, by getting the lawsuit, I sat down and said "Okay, I need to look and see if there's anything out there that shouldn't be out there." I did some deleting because I found some. I apparently did that again on the 4th. It wasn't in response to this letter because I hadn't read it, that portion of it. I know ignorance is no excuse, but I hadn't read it. It wasn't until I had gotten the letter to counsel and sat down that it was pointed out to me, at which point I didn't do anything else.

10/3/14 Hr'g Tr. 132-33. Barnes testified that after he received the cease and desist/document preservation letter, he authorized his attorney to offer to give back the QuickBooks files or dispose of them in any other manner that Plaintiff might choose. *Id.* at 140. He clarified that he purchased the Dell laptop from Tobin with his full approval, as evidenced by correspondence between Barnes

and Tobin in January, 2014, in which Tobin "okayed" Barnes's purchase of the laptop.  *Id*. at 142-43; Defs.' Ex. 4.  At that time, it was Barnes's understanding that Tobin was a member and an officer of PrimePay, the Plaintiff.  10/3/14 Hr'g Tr. 144.

Barnes testified that at his exit interview he informed the regional sales manager who was there in the office with him, and Jamie Press, the HR manager from PrimePay in Philadelphia, who was on the telephone, that he was planning to start a competing company.  *Id*. at 155.  With regard to the hiring of Laskie, Barnes testified that he advised her to talk to her attorney about what she could and could not do if she came to work for High Point and informed her that if High Point was sued due to her conduct after leaving PrimePay, she would be responsible for her own attorney fees.  *Id*. at 133-34.  He advised her to leave PrimePay "clean," and not to take anything with her, including paper documents and electronic files.  *Id*. at 161.  Barnes did not believe that Laskie was precluded from talking to referral sources, such as CPAs.  10/6/14 Hr'g Tr. 20-22.

Barnes acknowledged that client contacts and goodwill developed by him during his time at PrimePay belonged to PrimePay, not to him personally.  *Id*. at 168.  Barnes stated that he believed that the recorded information regarding clients and referral sources was confidential but that the people were not confidential - the fact that the information was written down somewhere in a database was confidential but not their identities.  *Id*. at 169-70.  Regarding the relationships with strategic business partners, Barnes testified that he never considered those relationships to be "assets" of PrimePay and that he continually told his salespeople "they had to kill [their] meat everyday . . . to go out everyday and meet with those CPAs and reaffirm that they're willing to refer to us."  *Id*. at 193.

Regarding his decision to leave PrimePay, Barnes testified that he felt he was "pushed out," because his job as president was eliminated and his salary to remain as a "client services manager" was going to be drastically lower ($210,000 to $80,000) than his salary had been as president of PrimePay-Michigan. *Id*. at 178, 179-80. In his filings with the United States Bankruptcy Court for the Eastern District of Michigan, Barnes stated that his position had been eliminated. *Id*. 179. Barnes did not receive a severance package from PrimePay. *Id*. at 181. Barnes conceded that when he filed to convert his Chapter 13 bankruptcy proceeding to a Chapter 7 proceeding based on his "constructive termination" from PrimePay, he in fact could have stayed at PrimePay and continued to receive a salary of $80,000/year. *Id*. at 183-84. Barnes also conceded that his attorney filed on his behalf a motion to terminate spousal support in Oakland County Circuit Court on March 28, 2014, representing that Barnes had "retired" when in fact at that time he had already incorporated High Point. ECF No. 24, Transcript of Preliminary Injunction Hearing held on October 6, 2014 at 10-13 (hereinafter 10/6/14 Hr'g Tr. __.") Barnes explained that because he was using retirement monies to fund High Point, he considered it retirement activity. *Id*. at 13. Barnes testified that he believed he was forced to retire from PrimePay because he could not survive on $80,000/year. *Id*. at 63.

### 6. Tracie Laskie

Barnes and Laskie both testified regarding the circumstances under which approximately 27 former PrimePay clients came to High Point. *Id*. at 28-40; 44; Defs.' Ex. 8. Many of the 27 clients came as a result of Laskie's relationships with certain CPAs and other referral sources and she explained as to each client the circumstances under which they left PrimePay to go to High Point. ECF No. 25, Transcript of Preliminary Injunction Hearing held on October 7, 2014 at 30-41

31

(hereinafter "10/7/14 Hr'g Tr. __.") With regard to relationships with CPAs and other referral sources, Laskie testified as follows:

> [A] payroll company does not own a CPA. We work to establish a relationship with them to get them to refer business to us, but we don't own them, so I cannot force a CPA to refer to me or anyone else. I just work that relationship.
>
>          *                   *                  *
>
> [H]onestly, I think the CPAs refer to me more than the company that I worked for because – so I honestly believe that, you know, when you work for a payroll company, it's really honestly the relationship that the salesperson develops with the CPAs that gets the referrals, and it wouldn't matter if I left and went to another payroll company. If they don't want to work with PrimePay, they're not going to work with PrimePay.

*Id*. at 57, 63. Laskie testified that when she joined PrimePay, she contacted the same CPAs with whom she had relationships at Paychex and that she was only prohibited from soliciting Paychex clients, not from contacting CPAs and other referral sources. *Id*. at 57. She testified that when she joined PrimePay, there were no CPA relationships in place that she assumed – she developed everything in her territory. *Id*. at 66.

Laskie testified that Barnes did not solicit her. Rather, she contacted him for a letter of reference when she decided to leave PrimePay and it was then that they discussed the possibility of her coming to work for High Point. *Id*. at 19. She testified that Barnes was "very apprehensive" of hiring her because of the non-solicitation Laskie had signed and only agreed to hire her after Laskie's counsel had reviewed her agreements with PrimePay. Barnes told her to "leave clean" and she did. She did not take client names, files or any PrimePay information with her. *Id*. at 20. Laskie testified that she did not directly solicit any former PrimePay clients while working at High Point but that several former customers did contact her, some expressing dissatisfaction with PrimePay's increased prices. *Id*. at 40.

32

## II.      PRELIMINARY INJUNCTION STANDARDS

A preliminary injunction is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 22 (2008) (citation omitted). Plaintiff bears the burden of demonstrating entitlement to preliminary injunctive relief and the burden is substantial. *Leary v. Daeschner*, 228 F.3d 729, 739 (6th Cir. 2000). Such relief will only be granted where "the movant carries his or her burden of proving that the circumstances clearly demand it." *Overstreet v. Lexington-Fayette Urban County Gov't*, 305 F.3d 566, 573 (6th Cir. 2002). When considering a motion for injunctive relief, the Court must balance the following factors: (1) whether the movant has a strong likelihood of success on the merits, (2) whether the movant would suffer irreparable injury absent preliminary injunctive relief, (3) whether granting the preliminary injunctive relief would cause substantial harm to others, and (4) whether the public interest would be served by granting the preliminary injunctive relief. *Certified Restoration Dry Cleaning Network, L.L.C. v. Tenke Corp.*, 511 F.3d 535, 540 (6th Cir. 2007). "These factors are not prerequisites, but are factors that are to be balanced against each other." *Overstreet*, 305 F.3d at 573. "The proof required for the plaintiff to obtain a preliminary injunction is much more stringent than the proof required to survive a summary judgment motion." *Leary*, 228 F.3d at 739. Plaintiff must do more than just "create a jury issue," and must persuade the court that it has a likelihood of succeeding on the merits of its claims. *Id.* "This is because the preliminary injunction is an extraordinary remedy involving the exercise of a very far-reaching power, which is to be applied only in [the] limited circumstances which clearly demand it." *Id.* (internal quotation marks and citation omitted) (alteration in original). "Although no one factor is controlling, a finding that there is simply no likelihood of success on the merits is usually fatal."

33

*Gonzales v. Nat'l Bd. of Medical Examiners*, 225 F.3d 620, 625 (6th Cir. 2000).

## III.   ANALYSIS

While Plaintiff's Eleven-Count Complaint sets forth a host of claims against Defendants, the motion for preliminary injunctive relief is limited to Plaintiff's trade secret, tortious interference and breach of fiduciary duty claims.[3]

### A.   PrimePay's Misappropriation of Trade Secrets Claim

### 1.   The MUTSA

Plaintiff seeks injunctive relief under Michigan's Uniform Trade Secrets Protection Act, Mich. Comp. Laws § 445.1901 *et seq*. ("MUTSA").  A "trade secret" is defined under MUTSA as:

> [I]nformation, including a formula, pattern, compilation, program, device, method, technique, or process, that is both of the following:
>
>> (I)  Derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use.
>>
>> (ii)  Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

Mich. Comp. Laws 445.1902(d).

Thus, a protectable trade secret under the MUTSA must be shown (1) to derive independent economic value from not being generally known, or discoverable through proper means, to others and (2) have been subject to reasonable efforts to maintain its secrecy.  *Mike's Train House, Inc. v. Lionel, L.L.C.*, 472 F.3d 398, 410 (6th Cir. 2006) ("For information to constitute a trade secret under

---

[3] Plaintiff also sought preliminary injunctive relief against Tracie Laskie but Laskie has since been dismissed from the case pursuant to a stipulated permanent injunction entered by the Court on October 7, 2014 (ECF No. 21, Stipulated Permanent Injunction).

Michigan law, the information must (1) derive economic value from the fact that it is not known to others who could make use of it, and (2) be the subject of efforts that are reasonable under the circumstances to maintain its secrecy.").

In determining whether information constitutes a trade secret under MUTSA, Michigan courts consider the following factors:

> (1) extent to which information is known outside of owner's business, (2) extent to which information is known by employees and others involved in business, (3) extent of measures taken to guard secrecy of information, (4) value of information to owners and competitors, (5) amount of effort and money expended in developing information, and (6) ease or difficulty with which information could be properly acquired or duplicated by other.

*Dura Global Techs., Inc. v. Magna Donnelly Corp.*, 662 F. Supp. 2d 855, 859 (E.D. Mich. 2009) (quoting *Wysong Corp. v. M.I. Indus*. ., 412 F. Supp. 2d 612, 626 (E.D. Mich. 2005)). "'To be a trade secret, the information must, of necessity, be a secret.'" *Dura Global*, 662 F. Supp. 2d at 859 (quoting *Kubik, Inc. v. Hull*, 56 Mich. App. 335, 347 (1974)). "Trade secrets do not 'encompass information which is readily ascertainable, i.e., capable of being acquired by competitors or the general public without undue difficulty of hardship.'" *Dura Global*, 662 F. Supp. 2d at 859 (quoting *Kubik*, 56 Mich. App. at 348). "Matters of public knowledge or general knowledge in the industry, or ideas which are well known or easily ascertainable, cannot be trade secrets." *Allis-Chalmers Mfg. Co. v. Continental Aviation and Engineering Corp.*, 255 F. Supp. 645, 654 (E.D. Mich. 1966) "'[I]t is widely accepted that a trade secret can exist in a combination of characteristics each of which, by itself, is in the public domain.") *Mike's*, 472 F.3d at 411 (quoting *Catalyst & Chem. Servs., Inc. v. Global Ground Support*, 350 F. Supp. 2d 1, 9 (D.D.C. 2004)) (alteration in original). "[U]nder Michigan law a new combination of known steps or processes can be entitled to trade-secret protection." *Mike's*, 472 F.3d at 411. Knowledge developed by an employee about how to address

35

a particular customer's peculiar needs, or having developed solutions to specialized needs, can constitute a trade secret. *See Hayes-Albion v. Kuberski*, 421 Mich. 170, 184-85 (1985) ("Specific information regarding resolution of the problems of a particular customer is a trade secret" and use of such information can be enjoined if a departing employ uses such "secret processes" in providing for that customer's needs on behalf of his new employer). "[E]vidence demonstrating that the information plaintiff sought to protect was common knowledge," can defeat a claim of misappropriation. *Id.* at 186.

"An employer's 'pricing schemes, the details of its customer contacts, its markups, [and] employee information' are examples of possible 'trade secrets' under the MUTSA." *Kelly Servs., Inc. v. Greene*, 535 F. Supp. 2d 180, 187 (D. Me. 2008) (interpreting Michigan's trade secret act) (quoting *Kelly Servs., Inc. v. Eidnes*, 530 F. Supp. 2d 940, 951-52 (E.D. Mich. 2008)(alteration in original). However, "a list of customers compiled by a former employee from personal and public sources available to that employee is not protectable as a trade secret." *Raymond James & Assoc., Inc. v. Leonard & Co.*, 411 F. Supp. 2d 689, 695 (E.D. Mich. 2006).

"'A plaintiff in a trade secrets case bears the burden of pleading and proving the specific nature of the trade secrets.'" *Dura Global*, 662 F. Supp. 2d at 859 (quoting *Wilson v. Continental Dev. Co.*, 112 F. Supp. 2d 648, 662 (W.D. Mich.1999)). "'A party alleging trade secret misappropriation must particularize and identify the purported misappropriated trade secrets with specificity.'" *Dura Global*, *supra* at 859 (quoting *Compuware Corp. v. Int'l Business Machines*, 2003 WL 23212863, *6 (E.D. Mich. Dec. 19, 2003)). Thus, the claimed trade secret must be specifically identified, and its unique economic value explained:

> Michigan courts have held that an alleged trade secret must be identified "clearly, unambiguously, and with specificity." *Utilase, Inc. v. Williamson*, No. 98–1233,

36

98–1320, 1999 WL 717969, at *6 (6th Cir. Sept.10, 1999) (quoting *Shatterproof Glass Corp. v. Guardian, Glass Co.*, 322 F. Supp. 854, 867 (E.D. Mich. 1970)). Accordingly, "[a] party alleging trade secret misappropriation must particularize and identify the purportedly misappropriated trade secrets with specificity." *Compuware Corp. v. Intern. Bus. Machs. Corp*., 2003 WL 23212863, at *6 (E.D. Mich. Dec.19, 2003). (citing *Utilase*, 1999 WL 717969, at *6). The identification of alleged trade secrets is important because "the general knowledge of an employee does not constitute a trade secret," *Lowry Holding Co., Inc. v. Geroco Tech Holding Corp*., No. 303694, 2012 WL 1890231, at *3 (Mich. Ct. App. 2012), and the concept of misappropriation of trade secrets "must not compromise the right of employees to change jobs." *Degussa Admixtures, Inc. v. Burnett*, 277 F. App'x 530, 535 (6th Cir. 2008). Accordingly, to establish a trade-secrets claim, the party "must establish more than the existence of generalized trade secrets and a competitor's employment of the party's former employee who has knowledge of trade secrets." *Id*. (quoting *CMI Int'l, Inc. v. Internet Int'l Corp*., 251 Mich. App. 125, 649 N.W.2d 808, 813 (2002)).

*Dana Ltd. v. American Axle and Mfg. Holdings, Inc*., No. 10-450, 2012 WL 2524008, at *9 (W.D. Mich. June 29, 2012).

"Sufficient measures" taken to protect confidential information as a trade secret under MUTSA have been found in "'either an express agreement between the employer and employee restricting or prohibiting disclosure by the latter to third parties; a disclosure by employer to employee in confidence or with a tacit understanding, inferable from the attendant circumstances, that the information is confidential; or security precautions utilized by the employer to insure that only a limited number of authorized individuals have access to the information.'" *Wysong Corp. v. M.I. Ind.*, 412 F. Supp. 2d 612, 626 (E.D. Mich. 2005) (quoting *Kubik Inc. v. Hull*, 56 Mich. App. 335, 347-48 (1974)).  A departing employee need not be subject to a covenant not to compete in order to violate the MUTSA where the employee agreed to keep his employer's confidential information protected from disclosure to others and, upon departure, retains and discloses or threatens to disclose those secrets in the course of his subsequent employment. *Henkel Corp. v. Cox*, 386 F. Supp. 2d 898, 903-04 (E.D. Mich. 2005) (although not subject to a covenant not to compete,

defendant did sign an agreement forbidding disclosure of confidential information and evidence of his subsequent utilization of his former employer's secret formula for the benefit of his new employer demonstrated a likelihood of success on the claim of actual or threatened misappropriation under the MUTSA).

The MUTSA defines misappropriation as either of the following:

(I) Acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means.

(ii) Disclosure or use of a trade secret of another without express or implied consent by a person who did 1 or more of the following:

(A) Used improper means to acquire knowledge of the trade secret.

(B) At the time of disclosure or use, knew or had reason to know that his or her knowledge of the trade secret was derived from or through a person who had utilized improper means to acquire it, acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use, or derived from or through a person who owed a duty to the person to maintain its secrecy or limit its use.

(C) Before a material change of his or her position, knew or had reason to know that it was a trade secret and that knowledge of it had been acquired by accident or mistake.

Mich. Comp. Laws § 445.1902.

Although "threatened misappropriation" has not been expressly adopted by Michigan courts, "[t]o establish threatened misappropriation, a party must specifically identify the trade secret likely to be misappropriated and must convince the court of the former employee's "duplicity" by proffering evidence indicating a significant lack of candor or willingness to misuse trade secrets." *Gene Codes Corp. v. Thomson*, No. 09-14687, 2011 WL 611957, at *5 (E.D. Mich. Feb. 11, 2011) (citing and quoting from *CMI Intern., Inc. v. Intermet Intern. Corp.*, 251 Mich. App. 125, 649 (2002)) (citations omitted).

38

"A trade secret will not be protected by the extraordinary remedy of injunction on mere suspicion or apprehension of injury. There must be a substantial threat of impending injury before an injunction will issue." *Allis-Chalmers*, 255 F. Supp. at 654. *See also Kelly Servs., Inc. v. Marzullo,* 591 F. Supp. 2d 924, 942 (E.D. Mich. 2008) ("It is well established that an injunction will not lie upon the mere apprehension of future injury or where the threatened injury is speculative or conjectural.") (internal quotation marks and citations omitted). Where "evidence and arguments [are] presented in support of both parties' contentions" in a trade secrets case, and plaintiff fails to identify an actual lost customer, plaintiff cannot establish "a substantial likelihood of success on the merits" and injunctive relief is not warranted. *Kelly Servs., Inc. v. Pinstripe, Inc.*, No. 06-10801, 2006 WL 2796018, at * 5 (E.D. Mich. Sept. 27, 2006).

### 2.     Likelihood of success on Plaintiff's MUTSA claim.

Every company is entitled to protection of its trade secrets, but the nature of the product and the transparency of the industry metrics in general cannot be ignored in evaluating a misappropriation claim. For example, this case involves payroll processing services, not the formula for Coca Cola. In this case, it appears undisputed that Barnes, who has been in the payroll services industry for over 20 years, left PrimePay and retained electronically stored, confidential PrimePay information on his Dell laptop. But his retention of PrimePay's confidential information, while it may or may not have violated other laws or contractual obligations, does not, standing alone, amount to misappropriation of trade secrets. *Raymond James*, 411 F. Supp. 2d at 695 ("'[A]n interest in maintaining confidentiality may not, in itself, necessarily elevate information to the status of a trade secret.'") (quoting *Merrill Lynch v. E.F. Hutton & Co.*, 403 F. Supp. 336 (1975)) (alteration in original).

Plaintiff bears the burden of establishing a claim of misappropriation of trade secrets and must (1) "particularize and identify" the material that it claims qualifies for trade secret protection, (2) establish the independent economic value of the material, (3) establish the measures taken to protect the material and maintain its secrecy, (4) establish that Barnes actually disclosed or used the information or evidenced a lack of candor and willingness to misuse the information. At the very least, it is undisputed that much of the information retained on Barnes's laptop was PrimePay's confidential business information and even Barnes agrees that he should not have retained such information on his laptop as he set off to establishing a competing business.

### a.   Identification of the alleged "trade secrets"

To be characterized as "trade secrets," the information PrimePay seeks to protect must be shown to (1) derive independent economic value from not being generally known, or discoverable through proper means, to others and (2) have been subject to reasonable efforts to maintain its secrecy. Martin Stowe testified that in his opinion, the QuickBooks files, the monthly statistics spreadsheets which measured several business analytics including revenue sources and sales activity, were confidential PrimePay information that qualified as trade secret material. Stowe also testified to the systems in place at PrimePay to password protect this information, which is likely sufficient to establish reasonable efforts to maintain the secrecy of this information.[4]

Very little evidence was presented, however, to establish that any of this information derives independent economic value from not being generally known or readily ascertainable by a

---

[4] Of note is the fact that PrimePay never sought to protect the confidentiality of its alleged trade secret material when filing materials in this litigation. Although attaching reams of allegedly trade secret information in support of its motion for a preliminary injunction, PrimePay never sought to have any of this information filed under seal.

40

competitor.  Particularly with regard to the strategic business partners, the testimony is undisputed that "no one owns" the CPAs or other referral sources and that strategic business partners are free to refer business to any payroll services company of their choice.  There is no contractual relationship between any of the strategic business partners and PrimePay and in fact sales associates are instructed to work very hard to keep those sources referring to PrimePay.  Arguably some competitive value could be derived from learning which strategic business partners had referred clients in the past, perhaps narrowing the field of prospects or streamlining the sales associate's work in creating a strategic partner referral base.

With regard to the business analytics information, such as profit and loss, revenue, monthly financial statistics, some of which admittedly was resident on Barnes's personal laptop after he left PrimePay, PrimePay suggests that because Barnes conceded that much of this information is confidential PrimePay material, they have made their case for trade secret protection.  As noted *supra*, a desire to maintain the confidentiality of information "may not, in itself, necessarily elevate information to the status of a trade secret." *Raymond James*, 411 F. Supp. 2d at 695.  PrimePay must go further and demonstrate that the information has independent economic value from not being readily known to its competitors.  In its reply brief in support of its motion for preliminary injunctive relief, Plaintiff states that information regarding "client accounts, client revenue and the company's financial information such as its profits . . . is not generally known and provides a competitive advantage to a competitor."  ECF No. 18, Reply 2.  Martin Stowe testified that this type of financial information would be of significant competitive value because it would "provide a competitor with a blueprint of revenue buildups, profitability, basically how to build a business," and would allow a competitor to approach a potential customer with knowledge of what prices they have paid and

41

what discounts they have been offered.  ECF No. 22, Hr'g Tr. 38-41.

The Court finds that this evidence still falls short of explaining with any degree of clarity how this information, given this particular industry, has competitive value from not being generally known to every other payroll services company or how this type of information could be used by a competitor to steal customers.  Barnes suggests, for example, that the pricing information was out of date and that in the payroll services industry, a competitor can simply ask a potential customer how much they pay for their payroll services and quote the customer accordingly, effectively undercutting the competition.  ECF No. 23, Hr'g Tr. 198.  However, because the Court concludes at this stage of the proceedings, as discussed *infra*, that Plaintiff has failed to establish a strong likelihood of success on misappropriation, it can assume without deciding, for purposes of this preliminary injunction analysis, that PrimePay would have a strong likelihood of establishing the existence of trade secret information among the material found on Barnes's laptop.

### b.      Misappropriation

Plaintiff proceeds on a theory of actual misappropriation and, alternatively, on a theory of threatened misappropriation.  But before discussing what the MUTSA prohibits, it is important to be clear about what it does not prohibit Barnes from doing in this instance.

In December, 2013, Barnes was making $210,000 as the President of what by all accounts was a very successful payroll processing company that he built himself from the ground up over the previous fifteen years.  In January, 2014, when Plaintiff consolidated the individually owned PrimePay entities, Barnes lost his position as President and his management salary was cut to $80,000.  Barnes decided to leave the company.  Barnes never signed a covenant not to compete or any agreement restricting his solicitation of PrimePay customers after he left PrimePay.  Indeed, at

his exit interview in early March, 2014, he informed Jamie Press that he would be setting up a competing business.

Barnes purposefully located his High Point office 50.5 miles away from PrimePay.  There is no evidence that he has ever directly solicited a former PrimePay client; some have sought him out and he has welcomed their business.  Now, because Plaintiff has learned that Barnes took his company-issued laptop with him when he left PrimePay (his purchase was approved by Chris Tobin) and because it has come to light that the laptop contains PrimePay confidential information, none of which (based on the preliminary injunction record) it appears likely that Barnes has *actually* accessed since his resignation except at the March 17, 2014 request of PrimePay, *see infra* discussion at section IIIA2bi,  Plaintiff seeks to shut down High Point and preclude Barnes from practicing his profession anywhere in the United States.

As noted before, there was no bargained-for contractual limitation on Barnes's ability to compete with PrimePay.  Thus, Barnes was free to solicit former PrimePay customers and to call on former referral sources, and in doing so he was free to use the knowledge he gained about those customers and referral sources while at PrimePay.  To read the MUTSA as preventing an employee who has been made privy to particular customer information in the course of his employment from ever using that knowledge when working for (or in this case becoming) a competitor would impose a *de facto* covenant not to compete to which the employee had never agreed.  In *McKesson Medical-Surgical, Inc. v. Micro Bio-Medics, Inc.*, 266 F. Supp. 2d 590 (E.D. Mich. 2003) (Duggan, J.), the court recognized the danger inherent in limiting the employment opportunities of a departing employee through a trade secrets suit when that employee did not sign an agreement not to compete with its former employer and did not agree not to use or divulge certain confidential information.

In *McKesson*, the plaintiffs had been employed by McKesson and prior to leaving to work for a competitor they compiled a list of their customers at McKesson.  They sent the list to their new employer and that new employer contacted those customers introducing the plaintiffs as now being affiliated with their new employer.  *Id*. at 592.  Plaintiffs subsequently were able to sell the new employer's products to some of its old employer's customers.  *Id*.  The court concluded that, in the absence of a bargained-for contractual agreement not to solicit their former employer's customers, or not to compete with their former employer, they were within their rights to have taken their own customer lists and to have solicited those customers in their new employment:

> In this Court's opinion, customer lists developed by the employee are not protectable "trade secrets." To the extent that the list of customers accumulated by the employee includes "needs of customers" as learned by employee during the course of his employment, such information is not protectable as a "trade secret." It is, however, protectable under an agreement in which the employee agrees not to disclose such information. *See Hayes–Albion [v. Kuberski*, 421 Mich. 170, 183-84 (1985)].

> To hold otherwise, would subject every former employee who elects to call on customers he previously called upon with the former employer to a lawsuit for "trade secret" violation because it is likely, in all those situations that, the former employee would be aware of the needs of these customers which he/she learned about during employment with the previous employer. To allow McKesson to prevail on its trade secrets claim in the case at bar would essentially interpret the MUTSA to be a blanket, statutorily created non-compete agreement between sales people and their former employers. This would not serve the purpose of trade secrets law. *See Fleming Sales Co., Inc. v. Bailey*, 611 F.Supp. 507, 514 (N.D.Ill. 1985), (stating that allowing a similar claim would "not strike a proper balance between the purposes of trade secrets law and the strong policy in favor of fair and vigorous business competition").

> If an employer wishes to restrict an employee's use of such information after the employment relationship is terminated, the employer must do it with an appropriate non-competition agreement.

266 F. Supp. 2d at 596-97.  *See also Raymond James*, 411 F. Supp. 2d at 696 (finding that a customer list developed by an employee who did not sign a covenant not to compete was not

necessarily a trade secret and concluding that finding otherwise would "essentially interpret the MUTSA to be a blanket, statutorily created non-compete agreement between sales people and their former employer. . . . [which] would not serve the purpose of trade secrets law."). "If an employer wishes to restrict an employee's use of such information after the employment relationship is terminated, the employer must do it with an appropriate non-competition agreement." *Id. See also Degussa Admixtures, Inc. v. Burnett*, 471 F. Supp. 2d 848, 855 (W.D. Mich. 2007) (noting that plaintiff acknowledged that defendant's customer lists and personal relationships with those customers are not trade secrets); *Allis-Chalmers*, *supra*, 255 F. Supp. at 652-53 ("[A]n individual has the right to change his employment for whatever reason he wishes and the right to utilize his general skill, knowledge and experience for the benefit of his employer. Indeed it is inevitable that some of the knowledge acquired while in the former employment should be made available to the new employer, and courts will not deprive the employee of the right to use the skill he developed throughout the years.").

Bearing in mind what Barnes was free to do when he left PrimePay, the threshold issue before the Court in the face of Plaintiff's request for this extraordinary injunctive relief is whether there is a substantial likelihood that Plaintiff will succeed on its claim that nonetheless Barnes has misappropriated PrimePay's trade secrets in setting up a competing business as High Point. Plaintiff proceeds on both an actual and threatened theory of misappropriation and the Court examines them separately.

45

### i) **Actual Misappropriation**[5]

In its supplemental post-hearing brief, Plaintiff clarifies the conduct that it claims constitutes

actual misappropriation of trade secrets by Barnes and HBS:

> PrimePay has demonstrated actual misappropriation by Barnes and HBS. Barnes has
> retained and used the "Act!RandyPersonal" on the Dell laptop, which he has
> admitted contains CRM data belonging to PrimePay. (Doc. #23, Tr. 185.) He also
> has been caught red-handed accessing his PrimePay Outlook files on March 26, 2014
> and the OneNote file containing PrimePay's reconciliation data on April 18, 2014.
> These files and the Act! database remain active files on the Dell laptop, which is in
> Barnes' possession.

ECF No. 27, Supp. Br. at 7.

First, as to Barnes's personal Act! database, the discussion *supra* puts to rest any claim based

upon his access to such a list that was developed through his personal effort. The testimony at page

185 of the transcript to which Plaintiff cites appears to be discussing not just Barnes's

Act!RandyPersonal file but "Pipeline, that whole sequence of CRM software" that was discussed

earlier in Barnes's testimony. Regardless, Barnes's concession that the material was confidential

to PrimePay does not change the law, which clearly permits him to maintain a personal list of

customers and to solicit them where, as here, he has not contractually bargained away his right to

do so. In any event, it is undisputed that Barnes last accessed his Act!RandyPersonal database in

November, 2013. ECF No. 23, 10/3/14 Hr'g Tr. 51-52. Thus, even if the Act!RandyPersonal

database was a PrimePay trade secret, which it is not, there is no evidence that Barnes accessed and

actually used that database after he left PrimePay. This fact does not suggest a likelihood of success

---

[5] Because the Court concludes, on the record presented at the preliminary injunction hearing, that
Plaintiff has failed to establish a strong likelihood of success on the merits of its claim that Barnes
accessed any PrimePay material after his resignation. The Court DENIES Defendants' Motion to
Reopen Hearing (ECF No. 31) as MOOT.

on a claim of actual misappropriation of trade secrets.

As to the only other instances of alleged "red-handed" actual access post-resignation on March 26, 2014 and April 18, 2014, at this stage of the proceedings, Plaintiff has failed to carry its heavy burden of convincing the Court that it will succeed on a claim of actual misappropriation based on these two instances. Plaintiff must do more than argue that the forensics suggest that Barnes accessed the documents - Plaintiff must demonstrate a "strong likelihood" of success on the merits of the claim that Barnes actually accessed this PrimePay confidential information after his resignation. Plaintiff's own forensic expert stopped short of testifying that Barnes accessed the material in Exhibit 17a (the alleged April 18, 2014 access event), which it turns out was *one* document that was found among the many files contained in the OneNote file that the forensics established was opened on April 18, 2014. Matthews testified on cross-examination as follows:

> Q:    So just to be clear . . . Exhibit 17a was accessed on April 18, correct?
>
> A:    I did not say those files were – for clarity, the last access date does not indicate that. The last written dates, for example, on the Unfiled Lists.OneNote file, the last written date of 4-18-2014 shows that the file was opened on that date, no doubt. . . . I have no way of comparing what may have been added, deleted, viewed. I just know that the file was opened based on that last written date of April 18, 2014.

ECF No. 23, 10/3/14 Hr'g Tr. 43-44. When viewed in light of Matthews' earlier testimony that a OneNote file is like an electronic notebook where you can store different files in a folder style status, it is manifest that while the OneNote file that contained Exhibit 17a, among many other files, may have been opened on April 18, 2014, Matthews's forensic analysis did not specifically determine that Exhibit 17a, a document that was held within that OneNote file, was accessed on that date. Plaintiff acknowledged this in its Supplemental Reply Brief:

47

> Mr. Matthews' testimony on the OneNote file was accurate. On April 18, 2014, Barnes opened the OneNote file, which contained Plaintiff's Exhibit 17(a). Mr. Matthews also explained to the Court that the OneNote file acts like a filing cabinet and contains numerous documents. Barnes and his computer consultant claim that he created an HBS document that same day, so he did not access the PrimePay document. This, again, is an issue of credibility. The access date for that OneNote file (which remains an active file with PrimePay and HBS material in it) is April 18, 2014. This Court should give little weight to Barnes' claims about which documents he may have viewed and which he did not.

ECF No. 32, Supp. Reply at 4. Barnes denies having accessed this document on this date or at anytime after leaving PrimePay. He admits that he may have opened the larger OneNote file to add something to it, but categorically denies opening Exhibit 17a. In seeking the extraordinary relief of a preliminary injunction, Plaintiff must do more than suggest that Barnes's alternate explanation for the opening of the larger OneNote file on April 18, 2014 should not be believed. Plaintiff did not eliminate the possibility that Barnes opened the OneNote file without accessing Exhibit 17a – indeed Plaintiff did not even cast significant doubt on that explanation.

Similarly, with regard to the alleged March 26, 2014 access of Barnes's PrimePay Outlook email account, Matthews conceded that his forensic analysis did not determine what activity took place when the Outlook mailbox was opened on that date:

> Q:    And my question to you is, in your view, is it impossible that [the March 26, 2014] opening was automatically a function of opening up another Outlook account on that same machine?
>
> A:    I don't know if it's possible or impossible.

ECF No. 23, 10/3/14 Hr'g Tr. 60. Plaintiff's counsel chose not to recross on this issue and again Plaintiff's post-hearing supplemental brief concedes the possibility that Barnes's explanation, that the March 26, 2014 opening of the PrimePay Outlook account was occasioned by the opening of a new High Point Outlook account, was a possible one:

> For the PrimePay Outlook file, Barnes retained the PrimePay Outlook account with PrimePay e-mails and attachments on the Dell laptop computer following his resignation. Barnes claims that he did not access it on March 26, 2014 and that the access date coincides with his creation of the HBS' Outlook account; however, in light of Barnes' credibility issues and his spoliation, his testimony should be given little weight.

ECF No. 32, Supp. Reply at 4.

While such argument may be persuasive at a subsequent stage of the litigation, Plaintiff's significant burden when seeking the extraordinary remedy of a preliminary injunction has not been met. In order to carry its burden of establishing not just a question of fact, but a high likelihood of success, on its claim that Barnes accessed his PrimePay Outlook account and the confidential materials it contained after he resigned from PrimePay, Plaintiff was required to rebut Barnes's explanation or at least present evidence casting doubt on its viability. With its own expert on the stand, Plaintiff was unable to do so.

Rather than directing the Court's attention to evidence that establishes to a high degree of certainty that in fact Barnes did access these two documents after his resignation, Plaintiff admits the possibility that Barnes in fact did not access them but urges the Court to disbelieve Barnes's explanation and to question Barnes's credibility generally. (ECF No. 32, Supp. Reply 4.) To support its request for the extraordinary remedy of injunctive relief, Plaintiff was required to do more. For these reasons, the Court concludes that Plaintiff has failed to demonstrate a strong likelihood of succeeding on its claim that Barnes actually accessed, much less utilized for competitive advantage, any confidential PrimePay information after his resignation from PrimePay.[6]

---

[6] Plaintiff also states in its supplemental post-hearing reply brief that Barnes "accessed PrimePay documents following his resignation, including, but not limited to, the documents in the New Folder and PrimePay folder in his DropBox account." ECF No. 32, Supp. Reply at 3. This statement is not supported by the evidence. Matthews clearly delineated those documents that the forensic analysis

### ii) Threatened Misappropriation

The MUTSA provides that both "[a]ctual or threatened misappropriation may be enjoined." Mich. Comp. Laws § 445.1903(1). Plaintiff asserts that if actual misappropriation is not found, "[a]t the very least, PrimePay has established threatened misappropriation. Barnes retains the Dell laptop, which contains PrimePay's trade secrets. His duplicitous conduct demonstrates threatened misappropriation." ECF No. 27, Supp. Br. at 7. The Court concludes that, at this stage of the proceedings, Plaintiff has not demonstrated a substantial likelihood that it will succeed in establishing the type of duplicity that has been considered sufficient to support a claim of threatened misappropriation.

Where plaintiff proceeds on a theory of "threatened misappropriation" through "inevitable disclosure" or otherwise, the burden of establishing a violation of the MUTSA under such a theory is more difficult to sustain. "The 'inevitable disclosure' doctrine . . . has not been adopted by Michigan courts." *Marzullo*, 591 F. Supp. 2d at 942. The Michigan Court of Appeals has noted that "[e]ven assuming that the concept of 'threatened misappropriation' of trade secrets encompasses a concept of inevitable disclosure, that concept must not compromise the right of employees to change jobs." *CMI Int'l, Inc. v. Intermet Int'l Corp.*, 251 Mich. App. 125, 132-33 (2002).

The MUTSA has been interpreted as requiring more than a generalized claim that a departing

---

determined had been accessed post-resignation: 1) the PrimeChecks material on or about March 17, 2014 (Plaintiff does not rely on this access, which Barnes explained responded to a request from PrimePay, for its actual misappropriation claim); 2) the OneNote file on April 18, 2014 and 3) the PrimePay Outlook account on March 26, 2014. With regard to access of the New Folder and the PrimePay folder in the DropBox account, which were deleted sometime in May, Matthews explicitly testified that he did not determine when those folders were last accessed. ECF No. 23, 10/3/14 Hr'g Tr. 45-46.

employee possessed trade secrets and would of necessity disclose them in his new employment:

> We hold that for a party to make a claim of threatened misappropriation, whether under a theory of inevitable disclosure or otherwise, the party must establish more than the existence of generalized trade secrets and a competitor's employment of the party's former employee who has knowledge of trade secret. . . . To establish threatened misappropriation, a party must specifically identify the trade secret likely to be misappropriated and must convince the court of the former employee's "duplicity" by proffering evidence indicating a significant lack of candor or willingness to misuse trade secrets.

*Gene Codes*, 2011 WL 611957, at *5 (citing and quoting from *CMI Intern., Inc. v. Intermet Intern. Corp.*, 251 Mich. App. 125, 649 (2002)) (citations omitted).  Plaintiff urges the Court to adopt the reasoning of the Seventh Circuit in *PepsiCo, Inc. v. Redmond*, 54 F.3d 1262 (7th Cir. 1995), interpreting the Illinois Trade Secrets Act.[7]  However, as courts interpreting the MUTSA have acknowledged, *PepsiCo* involved demonstrated acts of dishonesty on the part of the departing employee: "In *PepsiCo*, the Seventh Circuit's decision to affirm the District Court's decision rested in significant part on the lower court's determination that the former employee's conduct evidenced a lack of candor, and proof of his willingness to misuse trade secrets."  *Leach v. Ford Motor Co.*, 299 F. Supp. 2d 763, 775 (E.D. Mich. 2004).  Moreover, as this Court recognized in *Leach*, subsequent discussions of the inevitable disclosure doctrine by Michigan courts were "gratuitous" and "in dicta."  *Id*. at 775.  Michigan courts interpreting the MUTSA have cautioned against applying the *PepsiCo* holding to diminish the right of employees not subject to restrictive covenants not to compete to freely change jobs.  Conduct that unquestionably would violate a non-compete

---

[7]  Michigan courts have recognized that "Section 9 of the Michigan Uniform Trade Secrets Act requires that the act 'be applied and construed to effectuate its general purpose to make uniform the law with respect to the subject of th[e] act among states enacting it.' MCL 445.1909.  Thus, it is appropriate to seek guidance from the decisions of other jurisdictions. . . ." in interpreting the MUTSA.  *Niemi v. Am. Axle Mfg. & Holding, Inc.*, No. 269155, 2007 WL 29383, at *2 n. 1 (Mich. Ct. App. Jan. 4, 2007).

agreement may not amount to misappropriation of trade secrets. *See, e.g. Marzullo*, 591 F. Supp. 2d at 941-42 (distinguishing *PepsiCo* where plaintiff failed to proffer evidence of "duplicity" establishing that the departing employee lacked candor in assuming his new job responsibilities or demonstrated a willingness to misuse trade secrets); *MSC Software, Inc. v. Altair Engineering, Inc.*, No. 07-12807, 2009 WL 1856222, at *2-3 (E.D. Mich. June 25, 2009) (noting that Michigan has not endorsed the inevitable disclosure doctrine and concluding: "The individual defendants have knowledge of MSC's alleged trade secrets, MSC and Altair are strong competitors, and the individual Defendants may perform the same type of work at Altair that they performed at MSC, and use general knowledge gained from MSC at Altair. However, the fact that trade secrets may exist, and the fact that Altair employs the individual Defendants who have knowledge of the alleged trade secrets, are insufficient to allege a threatened misappropriation claim."). *But see Actuator Specialties, Inc. v. Chinavare*, No. 297915, 2011 WL 6004068 (Mich. Ct. App. Dec. 1, 2011) (finding sufficient duplicity and lack of trustworthiness where departing employee possessed confidential data, downloaded that data onto his new employer's system and utilized that data for the benefit of his new employer by altering one of his former employer's documents, replaced their letterhead with that of his new employer and failed to turn over USB devices and failed to preserve a USB device with downloaded data from his former employer's computer, despite receiving a cease and desist letter).

Plaintiff suggests that Barnes evidenced a willingness to misuse PrimePay's trade secrets when he deleted roughly 2,000 files from the PrimePay server before his departure. ECF No. 23, Hr'g Tr. 64-67; Pl.'s Exs. 19a, 19b. There has been no evidence presented at this stage of the proceedings that these documents were copied somewhere else or somehow retained by Barnes or

that he sought to convert this data to his own use. PrimePay suggests, however, that Barnes's deletion of them from the PrimePay server was a violation of the PrimePay technology policy, and presumably asks the Court to infer from this that therefore Barnes would be willing to misuse PrimePay's trade secrets if indeed he possessed them. ECF No. 23, Hr'g Tr. 67. Barnes explained, both in his Affidavit filed in support of Defendants' response to Plaintiff's motion for preliminary injunction, and also at the evidentiary hearing, that these files were deleted after Barnes met with Jason Wood, the PrimePay representative who was sent to meet with Barnes to find out how Barnes operated the Michigan branch. Mr. Wood told Barnes that PrimePay was doing things differently and had no need for the information contained in the documents that Barnes deleted. ECF No. 15, Ex. 5, Barnes Aff. ¶¶ 60-66; ECF No. 23, Hr'g Tr. 150-54. Plaintiff did not call Wood at the hearing or provide an Affidavit from him or in any way impeach Barnes on this point. Barnes may have violated the company technology policy in deleting these files and such claims are unaffected by this Court's preliminary injunction ruling. But Plaintiff has produced insufficient evidence for the Court to conclude at this stage of the proceedings that there is a strong likelihood that Plaintiff will succeed in establishing that these file deletions were intentional duplicitous acts manifesting Barnes's willingness to misuse PrimePay's trade secrets.

Plaintiff also suggests duplicity in Barnes's retention of his laptop, but this argument also misses the mark. It is undisputed that Chris Tobin authorized Barnes to purchase the laptop and that Barnes did not try to "secretly" make off with the laptop or its contents when he left PrimePay. PrimePay never contradicted this testimony with evidence that Tobin never authorized such a purchase or that Barnes was lying about the purchase transaction. It was reasonable for Barnes to assume that Tobin, who was then an equity owner of PrimePay by virtue of the asset purchase,

represented the knowledge of PrimePay generally. And when Barnes received a call from Mike Stowe asking him if he had the PrimeChecks data and if so would he provide it to Amy Wasilewski, Barnes did so immediately. The tone of Barnes's communications with PrimePay regarding the PrimeChecks data certainly does not indicate suspicion on PrimePay's part that the data had been or would be misused by Barnes. The Court concludes that the mere act of Barnes's retention of his PrimePay laptop, which he openly purchased from Chris Tobin, which it now appears contains PrimePay related confidential information, none of which it appears, at this stage of the proceedings, that Barnes actually accessed after leaving PrimePay, does not establish a strong likelihood of establishing the type of duplicity required to establish threatened misappropriation.

Plaintiff relies on *MLive Media Grp. v. Webber*, No. 14-13148, 2014 WL 4374376 (E.D. Mich. Sept. 4, 2014), but that case is clearly distinguishable. The departing employee in that case secretly copied data onto a thumb drive from MLive's computer before leaving, and expressed the intent to use material for the benefit of her new employer, including a document entitled "key account growth plan," which detailed MLive's training program for new hires. 2014 WL 4374376, at *3. The district court observed the following duplicitous conduct:

> A review of Webber's phone revealed text messages from Webber in which she claimed to have copied all of her MLive data on her computer to a USB device. Her text messages further show that she copied the material knowing that she would start working at Gannett, one of MLive's largest competitors, on August 18, 2014, and that she planned to shift her clients over to Gannett one by one. Indeed, the day before Webber's termination, she submitted a thirty-day cancellation notice for one of her larger customers.

2014 WL 4374376, at *2. When confronted with a cease and desist letter requesting that she return MLive's property and allow an inspection of her computer, she refused MLive access to her electronically stored information. *Id*. MLive's forensic exam of Webber's work computer disclosed

the use of two USB devices and a cloud-based drop-box shortly before her departure, neither of which Webber had granted Mlive access to review. *Id.*   Moreover, the customer list she allegedly took was not the product of her personal efforts. *Id.*

To the contrary here, Barnes purchased the laptop in an open transaction with his former boss who was then an equity owner of Plaintiff, he testified that he attempted to delete PrimePay-related material before he left PrimePay and offered complete access to PrimePay's forensic analyst when it came to light that he had failed to remove all of PrimePay's information.  This evidence does not indicate a strong likelihood that Plaintiff will be able to establish that Barnes was plotting and planning to steal away with PrimePay's confidential information, so as to capitalize on that information and gain a competitive advantage in his business at High Point.  In the five months following his resignation, when he was working to set up his new business, it appears based on the evidence Plaintiff has offered thus far that he never *actually* accessed any of the alleged trade secret information.

Nor is this case like *Pepsi-Co*, which involved demonstrated acts of dishonesty on the part of the departing employee.  Unlike Barnes, who was forthright in his exit interview about the fact that he intended to set up a competing business, the employee in *PepsiCo* kept PepsiCo in the dark while he negotiated to join a competitor.  In *PepsiCo*, the Seventh Circuit observed that the defendant's "lack of forthrightness on some occasions, and out and out lies on others, in the period between the time he accepted the position with defendant Quaker and when he informed plaintiff that he had accepted that position [led] the [district] court to conclude that defendant Redmond could not be trusted to act with the necessary sensitivity and good faith under the circumstances in which the only practical verification that he was not using plaintiff's secrets would be defendant Redmond's

word to that effect." 54 F.3d at 1270 (alterations added). Importantly, as discussed *supra*, Michigan courts interpreting the MUTSA have cautioned against applying the *PepsiCo* holding to diminish the right of employees not subject to restrictive covenants not to compete to freely change jobs.

This case is factually similar to *Sunbelt Rentals, Inc. v. Victor*, No. 13-2420, 2014 WL 492364 (N.D. Cal. Feb. 5, 2014), decided under the similarly worded California Trade Secrets Act. In *Sunbelt*, it was established that the departing employee (Victor) had emailed customer lists and pricing information to his personal email while he was employed by Sunbelt and some of it he emailed just shortly before he left Sunbelt to work for a competitor. *Id*. at *7 n.4. The court concluded that the pricing information was likely protected as a trade secret and assumed, for purposes of the misappropriation analysis, that the customer lists also were entitled to trade secret protection. *Id*. at *6 n. 2. Victor argued that this was his normal business practice, placing this information in his personal email so that he could more easily access the information when calling on clients. *Id*. at *4. Sunbelt argued that Victor intended to use this proprietary information to solicit Sunbelt customers after he left Sunbelt. *Id*. at *10. The court concluded that the "simple fact that Victor emailed himself ostensibly proprietary information, without more, does not show misappropriation." *Id*. at *7. The court concluded that absent "compelling evidence" that the departing employee had used the alleged trade secret information to solicit business from existing customers of his former employer, the defendant was unlikely to succeed on its misappropriation claim and an injunction was "unwarranted." *Id*. at *10. So too here. While Plaintiff alleges that Barnes will use the PrimePay information that remains resident on his laptop to undercut Plaintiff's pricing and customer discounting, there has been no evidence that Barnes has done so, or shown a willingness to do so, as to even a single customer. Discovery may yield additional or different

56

information on this point.  But at this stage of the proceedings, Barnes's mere retention of the PrimePay information on his laptop is insufficient to establish a likelihood of success on Plaintiff's threatened misappropriation claim.

Finally, the fact that Barnes may or may not have made misrepresentations in his bankruptcy proceedings and his divorce proceedings about his retirement status does not necessarily demonstrate a willingness to misuse Plaintiff's trade secret information.  Cases finding sufficient duplicity to support a threatened misappropriation claim rely on a lack of candor related to a willingness to misuse the trade secrets themselves, not on the employee's general character for honesty and truthfulness. For example, in *Actuator Specialties*, *supra*, the court found the following facts supported a finding that the departing employee would likely be willing to misuse his former employer's trade secrets:

> ASI showed that not only did defendant possess confidential ASI data, defendant also downloaded that data onto [his new employer's] computer system and utilized that data for the benefit of [his new employer]. In addition, despite the knowledge of the entry of a TRO that specifically compelled defendant to turn over such data to ASI, defendant failed to do so. Significantly, defendant did not admit to having an ASI USB drive or return it to ASI until ASI learned of defendant's use of an ASI electronic form and confronted [his new employer] with the information.

2011 WL 6004068, at *3 (alterations added).

Here, Barnes immediately and fully cooperated with Plaintiff's request that he allow a computer forensic search of all of his computers.  Plaintiff has failed to produce evidence, at least at this stage of the proceedings, of Barnes's "duplicity" sufficient to establish a strong likelihood that it will succeed in proving that Barnes was engaged in underhanded conduct with regard to

PrimePay's confidential information and was willing to misuse PrimePay's trade secrets.[8]

**B.    Likelihood Of Success on Plaintiff's Tortious Interference and Breach of Fiduciary Duty Claims**

Preliminarily, to the extent that either Plaintiff's tortious interference or breach of fiduciary claims are premised upon the same acts alleged to constitute misappropriation of trade secrets, such claims are displaced by the MUTSA. "The MUTSA displaces claims that are 'based solely upon the misappropriation of a trade secret.'" *Wysong*, 412 F. Supp. 2d at 623 (quoting *Bliss Clearing Niagara, Inc. v. Midwest Brake Bond Co.*, 270 F. Supp. 2d 943, 946 (W.D. Mich.2003)). "'In determining whether a claim is displaced, courts generally examine whether the claim is based solely upon the misappropriation of a trade secret. If so, the claim must be dismissed.'" *Wysong*, 412 F. Supp. 2d at 623 (quoting *Bliss*, 270 F. Supp. 2d at 946).

**1.    Tortious interference.**

Plaintiff has failed to establish a substantial likelihood of success on its claim of tortious interference. To establish a prima facie case of tortious interference with a business relationship, plaintiffs must show:

> (1) the existence of a valid business relation (not necessarily evidenced by an enforceable contract) or expectancy; (2) knowledge of the relationship or expectancy on the part of the defendant interferer; (3) an intentional interference inducing or causing a breach or termination of the relationship or expectancy; and (4) resultant damage to the party whose relationship or expectancy has been disrupted. [O]ne who alleges tortious interference with a contractual or business relationship must allege the intentional doing of a per se wrongful act or the doing of a lawful act with malice

---

[8]  Martin Stowe testified that PrimePay has lost a total of 248 clients since the consolidation, 27 of which PrimePay claims have gone to High Point. 10/2/14 Hr'g Tr. 77. PrimePay did not present evidence of a single lost client who claimed to have been solicited by High Point, Barnes or Laskie. The large number of lost clients following the consolidation, the vast majority of whom did *not* transfer their business to High Point, indicates a larger, more systemic problem than alleged "unfair" competition from High Point.

and unjustified in law for the purpose of invading the contractual rights or business relationship of another.

*Michigan Podiatric Medical Ass'n v. Nat'l Foot Care Program*, 175 Mich. App. 723, 735-36 (1989) (internal quotation marks and citations omitted) (alteration in original). "To establish tortious interference, a plaintiff must show that the defendant unjustifiably instigated a breach of contract. . . . [O]ne who alleges tortious interference with a contractual or business relationship must allege the intentional doing of a per se wrongful act or the doing of a lawful act with malice and unjustified in law for the purpose of invading the contractual rights or business relationship of another." *CMI*, 251 Mich. App. at 131 (internal quotation marks and citations omitted) (alteration in original). "'Where the defendant's actions were motivated by legitimate business reasons, its actions would not constitute improper motive or interference.'" *Raymond James*, 411 F. Supp. 2d at 698 (quoting *BPS Clinical Laboratories v. Blue Cross & Blue Shield of Michigan*, 217 Mich. App. 687, 699 (1996)).

Plaintiff's evidence thus far does not establish a substantial likelihood that it will succeed in proving that Barnes acted with malice or intentionally interfered with a PrimePay business relationship or expectancy. Plaintiff asserts in its supplemental post-hearing brief that this claim is based upon (1) Barnes's allegedly instructing Laskie that she could continue to contact her referral sources and (2) High Point's alleged diversion of clients from PrimePay through Laskie's conduct in contacting those sources. First, Laskie testified that Barnes did not contact her to come work at High Point but that she contacted and asked him to serve as a reference when she interviewed for a job at Payroll 1. ECF No. 25, 10/7/14 Hr'g Tr. 19. It was only then that Barnes suggested that if she was leaving PrimePay, she should consider coming to work for High Point. *Id.* Barnes told her to leave PrimePay clean and she shared with Barnes the letter she had received from her attorney

explaining what she could and could not do for her new employer after leaving PrimePay. *Id*. at 20. No evidence was presented to rebut this testimony and thus there is no evidence to suggest a likelihood of success on any claim that Barnes instigated Laskie's departure from PrimePay with malicious intent.

Second, Laskie expressly testified that she acted in reliance on her counsel's advice regarding what she could and could not do after leaving PrimePay and joining a competing payroll services company. *Id*. Laskie testified that Barnes told her to leave clean and take nothing with her. *Id*. Laskie testified that she expressly discussed with her attorney the propriety of contacting her referral sources after leaving PrimePay and that he informed her, as the evidence at the hearing in this case suggests, that "technically a payroll company does not own a CPA," and this confirmed Laskie's understanding that she could continue to work with her referral sources but could not solicit PrimePay clients. *Id*. at 56-57. Laskie testified that she sought the advice of counsel on these matters because she "didn't want to get sued." *Id*. at 57.

Plaintiff relies on Dorfman's testimony that Laskie told him in her exit interview that Barnes told her that she could continue to contact her referral sources. ECF No. 22, 10/3/14 Hr'g Tr. 144. Dorfman and Laskie both confirmed in their testimony that during the exit interview the topic of referral sources was discussed and that the conclusion reached that day was that the only thing it was known for certain that Laskie was precluded from doing was soliciting PrimePay clients. *Id*. at 144; ECF No. 25, 10/7/14 Hr'g Tr. 28. Laskie's testimony is undisputed that her decision to continue contacting her referral sources after leaving PrimePay was based on the advice of her attorney.

The evidence adduced thus far simply does not suggest a substantial likelihood of success in proving that Barnes induced Laskie to violate her agreements with PrimePay. There is

60

insufficient evidence at this stage of the proceedings to suggest a substantial likelihood that Plaintiff will be able to establish that Barnes and/or High Point intended to compete with PrimePay with an unlawful purpose or malicious intent.

Moreover, as discussed *infra*, because Laskie no longer works for Barnes and is now subject to a stipulated order restricting her ability to compete with PrimePay, there is no basis for injunctive relief to prevent a continuing harm allegedly flowing from her employment at High Point. In any event, PrimePay has failed to present any evidence that a single former PrimePay customer was approached by Barnes or Laskie to leave PrimePay and switch to High Point. Not one customer affidavit was offered in support of the request for preliminary injunctive relief that would support the claim that any one of the 27 customers identified thus far left PrimePay because Barnes and/or Laskie sought them out and urged them to switch their payroll service company.

## 2. Breach of fiduciary duty.

PrimePay's breach of fiduciary duty claim is a bit of a moving target. In its initial motion for preliminary injunction, PrimePay alleged that Barnes had a "fiduciary obligation[] not to use or disclose [PrimePay's trade secrets and confidential] information during or upon termination of his employment." ECF No. 13, Mot. 21. Plaintiff asserted that Barnes's "formation and operation of HBS, his transfer or PrimePay data to the dropbox for misappropriation, his continued use of PrimePay's trade secrets constitute a breach of fiduciary duty, and his interference with PrimePay's clients through his deletion of data while employed constitute a breach of fiduciary duty." *Id*. at 21-22. Plaintiff cited Restatement (Second) Agency, § 396(b), which imposes a duty on an agent not to use or disclose his employer's confidential matters after termination of the agency. Plaintiff's opening brief cites no other authority in support of this claim.

61

Perhaps recognizing that its breach of fiduciary duty cannot be premised on the same conduct alleged to support its MUTSA claim, Plaintiff alters course in its supplemental brief and focuses only on Barnes's conduct while still employed by PrimePay as the foundation for its breach of fiduciary duty claim:

> [Barnes] breached his fiduciary duty to PrimePay through his deletion of critical files from PrimePay's server; his failure to migrate the Detroit office data, including but not limited to, the PrimeChecks data, QuickBooks files, and Act! database, from the Dell laptop to the server; his failure to provide the passwords for the Act! database; and his termination of the office's CRM software for its employees prior to their migration to PrimePay's Salesforece program.

ECF No. 27, Supp. Br. 8.

Plaintiff's supplemental brief cites no authority in support of its claim for injunctive relief on this breach of fiduciary duty claim and Plaintiff's supplemental reply does not even mention this claim. Even assuming this conduct, all of which was engaged in and completed when Barnes was still working for PrimePay, does support a claim for a breach of fiduciary duty, and thus does not support a claim for injunctive relief. While such conduct, if proven to have occurred as alleged, could have made things more difficult and costly for PrimePay, PrimePay offers no basis for the Court to conclude that an injunction is necessary to prevent a continued harm flowing from this conduct or to make them whole for this alleged breach, assuming that it can be proven. PrimePay argues that the loss of data allegedly held by or deleted by Barnes "hindered PrimePay's business" and made PrimePay unable to answer some PrimeChecks client's questions. ECF No. 27, Supp. Br. 9-10. PrimePay asserts that this conduct "hindered PrimePay's ability to transition the office and retain and grow the business." *Id*. at 10. PrimePay does not identify one lost one client that it attributes to this conduct nor does it endeavor to explain how an injunction prohibiting Barnes from competing with PrimePay is necessary or appropriate to redress these alleged wrongs or why these

62

losses cannot be compensated by a monetary award of damages. *See infra* discussion at section IIIC. Regardless of the likelihood that it might ultimately succeed on such a claim, PrimePay is not entitled to injunctive relief on this claim.

### C.    Evidence of Irreparable Harm Absent an Injunction

"'Loss of customer goodwill often amounts to irreparable injury because the damages flowing from such losses are difficult to compute.'" *Kelly Servs., Inc. v. Noretto*, 495 F. Supp. 2d 645, 659 (E.D. Mich. 2007) (granting preliminary injunctive relief under the MUTSA where the departing employee was subject to a non-compete, non-disclosure and non-solicit agreement and refused to return a company-issued flash drive containing work proposals for customers and prospective customers). However, Plaintiff must demonstrate that it is *likely* to suffer irreparable harm in the absence of an injunction. *See Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 22 (2008) ("Our frequently reiterated standard requires plaintiffs seeking preliminary relief to demonstrate that irreparable injury is *likely* in the absence of an injunction. . . . Issuing a preliminary injunction based only on a possibility of irreparable harm is inconsistent with our characterization of injunctive relief as an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief.") (emphasis in original) (internal citations omitted). "The 'key word' in determining the extent of an injury sufficient to support the award of injunctive relief is 'irreparable.' Mere injuries, however substantial, are not enough. Rather, 'the harm alleged must be both certain and immediate, rather than speculative or theoretical.'" *Hudson v. Caruso*, 748 F. Supp. 2d 721, 730 (W.D. Mich. 2010) (quoting *Michigan Coalition of Radioactive Material Users, Inc. v. Griepentrog*, 945 F.2d 150, 154 (6th Cir. 1991)). Irreparable injury can be demonstrated with "evidence that the harm has occurred in the past and is likely to occur again."

*Id*.

There has been no evidence presented at this stage of the proceedings to substantiate a claim of irreparable harm.  There is no evidence that even one of the 27 High Point customers identified as former PrimePay customers has been solicited by Barnes or that Barnes somehow used PrimePay's confidential information to acquire any one of them as clients of High Point.  There is thus no evidence, at this stage of the proceedings, that irreparable harm likely would flow in the absence of an injunction prohibiting Barnes and High Point from working in the payroll services industry or from soliciting or servicing PrimePay customers.

As discussed *supra*, Plaintiff does not adequately address the nature of any irreparable harm allegedly flowing from its breach of fiduciary duty claim other than to state that PrimePay has been "hindered" in its ability to transition the PrimePay-Michigan office. "Mere injuries, however substantial, in terms of money, time and energy necessarily expended in the absence of a stay, are not enough. The possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation, weighs heavily against a claim of irreparable harm." *Sampson v. Murray*, 415 U.S. 61, 90 (1974) (footnote and citation omitted).  Accordingly, as to each claim, this factor weighs against granting the broad injunctive relief that Plaintiff requests.

### D.      Harm to Others Should an Injunction Issue

As this Court has recognized, evaluating this factor requires, *inter alia*, consideration of the harm to the Defendants if an injunction should issue.  *Officemax, Inc. v. Medmax, Inc.*, No. 96-cv-73446, 1997 WL 1189354, at * 1 (E.D. Mich. Feb. 10, 1997) (noting that this third factor must consider "whether granting the injunction will cause harm to others, including Defendant").  Here, the broad injunction Plaintiff seeks will put Barnes out of business.  Barnes has already agreed not

64

to utilize any of the alleged trade secret material that Plaintiff has identified in this action and Barnes has agreed, although he is not compelled to do so, not to solicit PrimePay customers. Plaintiff seeks to prevent Barnes from working altogether in the industry he has worked in for over twenty years. Given the breadth of the injunctive relief sought by the Plaintiff in this case, this factor weighs against granting the broad and extraordinary relief requested.

### E.   Impact of an Injunction on the Public Interest

The public interest will not be served by an injunction where it functions only to prevent Barnes from working. "Filing a trade secret action to restrain legitimate competition and job mobility, needless to say, is not proper." *Degussa*, 277 F. App'x at 535-36. An injunction will also leave HighPoint's current customers without a payroll service company, and will deprive those customers, who wish to switch from PrimePay to High Point, of that choice. This factor weighs against the broad injunction that Plaintiff seeks.

## IV.   CONCLUSION

"A trade secret will not be protected by the extraordinary remedy of injunction on mere suspension or apprehension of injury. There must be a substantial threat of impending injury before an injunction will issue." *CMI*, 251 Mich. App. at 654. The Court concludes that Plaintiff has failed to establish a substantial likelihood of success on its trade secret claim sufficient to justify the extraordinary remedy of the broad requested injunctive relief. Additionally, Plaintiff has failed to establish a substantial likelihood of success on its tortious interference claim and has failed to separately identify the alleged irreparable harm that will result absent the requested injunctive relief from the alleged tortious interference and breach of fiduciary duty claims. Accordingly, the Court declines to issue the extremely broad injunctive relief that Plaintiff seeks.

However, it is undisputed that certain PrimePay proprietary and confidential information, information that Barnes concedes belongs to PrimePay and was allegedly accidentally retained by him, remains in Barnes's and/or HighPoint's possession.   The MUTSA provides that "[i]n appropriate circumstances, affirmative acts to protect a trade secret may be compelled by court order." Mich. Comp. Laws § 445.1903(3).  Plaintiff claims that Defendants have denied them access to certain cloud-based data, although Defendants respond that such a request has never been made. The Court also recognizes that this litigation is in its initial stages, discovery may not yet have begun in earnest and there is a need to ensure the preservation of evidence. Accordingly, the Court:

(1) DENIES the injunctive relief requested in Paragraph A of Plaintiff's Proposed Preliminary Injunction Order (ECF No. 13-8, Proposed Order);

(2) DENIES AS MOOT the injunctive relief requested in Paragraph B of Plaintiff's Proposed Order;

(3) GRANTS IN PART the injunctive relief requested in Paragraph C of Plaintiff's Proposed Order as to Defendants Barnes and High Point ONLY as follows:

- Defendants Barnes and High Point are enjoined and restrained, directly or indirectly, and whether alone or in concert with others, including any officer, agent, employee and/or representative of Defendants from:

    (1) using or disclosing any documents or software programs obtained from PrimePay or PrimePay of Michigan LLC, that contain PrimePay client lists, prospect lists or prospect contact information, client financial information, and related computer data such as data form PrimePay's QuickBooks and PrimePay's PrimeChecks and other bank accounts; or

    (2) destroying, erasing, or otherwise making unavailable for further proceedings in this matter, any records, telephonic records, or documents (including data or information maintained or stored in computer media) in Barnes or High Point's possession, custody or control, which were obtained from, or contain information derived from, any of PrimePay's or PrimePay-Michigan's proprietary and confidential records or information or which relate to the events alleged in the First Amended Complaint;

66

- Defendants Barnes and High Point, at a reasonable time within the date of this Order and under reasonably agreed upon procedures, and under such Protective Order as Defendants deem reasonable to protect their own confidential and proprietary information, and at Plaintiff's expense, shall:

   (1) permit the deletion and removal of proprietary and confidential records, data, and files of PrimePay from Barnes' and High Point's computers, work computers, discs, external hard drives, e-mail accounts, and cloud based storage systems (*e.g.* Barnes's drop-box) by Plaintiff's appointed forensic computer expert;

   (2) permit the inspection and forensic analysis of HighPoint's and Barnes's cloud-based storage applications and dropboxes;

   (3) identify all individuals, companies or organizations to whom Defendants disclosed, disseminated or transmitted for any purpose, any such documents or information.

- Barnes shall identify and produce to PrimePay all passwords and/or credentials to all web-based e-mail accounts and cloud or electronic storage databases containing any documents belonging to PrimePay or containing information relating to PrimePay's clients, financial, or accounting records.

This Order remains in full force and effect until such time as the Court orders otherwise.

IT IS SO ORDERED.


s/Paul D. Borman_____
PAUL D. BORMAN
UNITED STATES DISTRICT JUDGE

Dated:  May 20, 2015

## CERTIFICATE OF SERVICE

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on May 20, 2015.


s/Deborah Tofil_____
Case Manager

67